No. 103,527

STATE OF KANSAS, *Appellee*, v. MANUEL ULTRERAS, *Appellant*.

(295 P.3d 1020)

Opinion filed March 1, 2013.

*Kurt P. Kerns*, of Ariagno, Kerns, Mank & White, LLC, argued the cause and was on the briefs for appellant.

*Jacob G. Fishman*, assistant county attorney, argued the cause, and *Terry J. Malone*, county attorney, *Kevin O'Keefe*, assistant county attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

*Per Curiam*: This appeal raises first-impression issues regarding the burden of proof when a criminal defendant asserts immunity from criminal prosecution under the justified use of force provisions of K.S.A. 21-3219. We hold that the burden of production to negate a claim of immunity rests with the State and the controlling standard of proof is probable cause. Applying those holdings to the facts of this case, we conclude the district court erred in requiring the defendant to prove by a preponderance of the evidence that the use of force was lawful. Nevertheless, we hold this error was harmless.

In another issue we consider alternative means arguments relating to the aggravated battery statute, K.S.A. 21-3414. We hold the Kansas Legislature did not state alternative means of committing aggravated battery by separately referring to "bodily harm" and "disfigurement" in K.S.A. 21-3414(a)(2)(A) or "causing bodily harm . . . with a deadly weapon" and "causing bodily harm . . in any manner whereby great bodily harm, disfigurement or death can be inflicted" in K.S.A. 21-3414(a)(2)(B).

In response to other issues raised by the defendant, we conclude: The district court did not commit error by not giving a unanimity instruction because the defendant did not commit multiple acts of battery against the victim at issue in count II and, while the district court may have erred in denying the defendant the right to cross-examine witnesses regarding why they did not honor their subpoenas, the error was harmless beyond a reasonable doubt. Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY

Manuel Ultreras directly appeals his convictions for three counts of aggravated battery. In count I, Ultreras was convicted of the aggravated battery of Miguel Mendoza by recklessly causing great bodily harm or disfigurement in violation of K.S.A. 21-3414(a)(2)(A). In counts II and III, Ultreras was convicted of the aggravated battery of two brothers—Victor Urbina-Gonzales and Oscar Urbina, respectively. Count II was also a violation of K.S.A. 21-3414(a)(2)(A) while count III was a violation of K.S.A. 21-3414(a)(2)(B), which prohibits "recklessly causing bodily harm . . . to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted."

The convictions stem from a fight on the night of June 2, 2007, at a bar owned by Ultreras' father where Ultreras worked. Around 10 p.m., a group of men, including the three victims, arrived at the bar. Several of the men in the group were underage; consequently, the bar employees kept a close watch on the men to make sure those who were underage were not drinking. When two security guards saw Urbina-Gonzales, who was underage, drink from another person's alcoholic beverage, Ultreras' brother, who also worked at the bar, approached Urbina-Gonzales. Urbina-Gonzales denied drinking and refused a request to leave. The security guards began to physically escort Urbina-Gonzales out of the bar. Urbina-Gonzales resisted, and Urbina rushed to help him. A fight broke out.

According to testimony from the employees, Urbina-Gonzales punched one of the security guards in the face and Urbina picked up a pool stick as he approached the group. A security guard grabbed the pool stick and shoved Urbina against a ledge. The bar employees continued to move the group to the door.

Ultreras was behind the bar and near the door as the scuffle moved past him. He picked up a metal baton and joined in the fight, which moved outside to the sidewalk. The bar employees testified that, once outside, the group of men kept coming toward them. The employees tried to block the door, but individuals grabbed the door, threw punches, and refused to leave.

Urbina-Gonzales testified the security guards put him in a head-lock and Ultreras hit him on "my head, my ribs, my arms," causing him to "blackout" for a "[c]ouple of seconds, 20, 20 seconds, 15-20 seconds." He explained he was inside the club when he blacked out and "[t]he next thing I know we were outside the club. They were still attacking us [on] the sidewalk." At that point, Ultreras hit him with the metal baton, causing him to lose one tooth and reduction of two other teeth to form a crown.

Urbina testified that when he came to his brother's defense, he told the security guards he would remove his brother from the bar. The bar employees pushed him out of the bar and, once outside on the sidewalk, Ultreras hit him with the metal baton. Urbina testified that after he and his brother moved toward their car, he came back and asked if he could go back inside to retrieve his brother's cell phone. Ultreras denied the request and swung the baton at Urbina's head. Urbina raised his arm in defense, and the resulting blow to his arm led to a bump that Urbina still had at the time of the trial.

A third victim, Mendoza, testified that he voluntarily left the club after Urbina-Gonzales and Urbina had been removed. Once outside, Mendoza walked across the street, away from the altercation but, after watching the Urbina brothers take additional blows on the sidewalk, he walked to the middle of the street and yelled for the Ultreras brothers and the security guards to stop. Ultreras then approached Mendoza in the middle of the street and said in Spanish, "Oh, you want some too, fucking cowboy." Ultreras then struck Mendoza in the testicles with the baton, causing Mendoza to double over in pain. According to Mendoza, Ultreras hit him with the baton three more times.

When the police arrived at the scene, several people were "fighting or arguing" in the street. According to officers' testimony, all three victims were on their feet, agitated, and excited. All three victims refused medical treatment at that time, but a short time later Mendoza went to a hospital. He was diagnosed with severe trauma to his right testicle. He remained under a urologist's care for several months, during which he continued to experience pain and swelling. Approximately 80 days after the incident, he required

surgery because of a growing mass in his testicle that was caused by the trauma.

Ultreras was ultimately charged with three counts of aggravated battery. Before trial, Ultreras filed a motion to dismiss claiming immunity from criminal prosecution under K.S.A. 21-3219. He argued his actions were justified in defense of others or property other than a dwelling.

The district court held a hearing on the motion. At the hearing, the parties argued about who had the burden of proof for the motion and what the proper procedure was for raising an immunity claim under K.S.A. 21-3219. The district court acknowledged that there was very "little law which [gave] . . . any guidance on this particular statute." Relying in part on a Colorado decision, the court concluded Ultreras, as the movant, had the burden to prove by a preponderance of the evidence that his use of force was necessary. The district court then determined that Ultreras had failed to meet that burden. The court rejected Ultreras' reliance on defense of property, noting that Ultreras' testimony indicated that he had not acted in an attempt to prevent property damage as the fight progressed toward the door or because of an attempt to protect the bar's license. The judge then addressed Ultreras' claim that he was defending himself or others, stating:

"So really we're looking based on your testimony and your brother's testimony whether or not you have met by a preponderance of the evidence that use of force was necessary in defense of a person. The law does not allow someone to use force to protect someone and then become an aggressor. There is evidence in the record that would support, . . . you did maybe initially get involved in this incident to protect your security guards and your brother, but then once it moved outside you became an aggressor. But that's ultimately something a jury is going to have to decide. I have to decide merely if there's enough evidence here by a preponderance that you are entitled to statutory immunity under defense of a person.

"It appears to me that based even on you and your brother's testimony that you and the security guards were able to handle this situation in a non particularly violent manner. I'm sure there [were] hands on each other and pushing and shoving but you were able to get this group of people outside. You could have shut the door behind you and the situation would have been over. You chose to stay out on the side and by your own testimony that's when you began hitting the one person you have identified you struck with the metal [baton]. Therefore, based

on that evidence it does not appear by a preponderance that you are entitled to statutory immunity . . . ."

Consequently, the case proceeded to trial, during which the jury was instructed on Ultreras' theories of defense of others and defense of property. After apparently rejecting Ultreras' defense, the jury convicted him on all three counts. His direct appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

## IMMUNITY UNDER K.S.A. 21-3219

Ultreras complains that the district court improperly interpreted the requirements for establishing immunity from criminal prosecution under K.S.A. 21-3219. He challenges the court's finding that the burden to prove immunity by a preponderance of the evidence rested with him, argues the court improperly factored his failure to retreat into the immunity consideration, and ultimately disagrees with the district court's finding that the evidence did not prove his use of force was justified.

His arguments require us to interpret and apply K.S.A. 21-3219. Issues of statutory interpretation present questions of law over which this court exercises unlimited review. *State v. Brown,* 295 Kan. 181, 193-94, 284 P.3d 977 (2012); *Stewart Title of the Midwest v. Reece & Nichols Realtors,* 294 Kan. 553, 557, 276 P.3d 188 (2012).

K.S.A. 21-3219 provides:

"(a) A person who uses force which, subject to the provisions of K.S.A. 21-3214, and amendments thereto, is justified pursuant to K.S.A. 21-3211, 21-3212 or 21-3213, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

"(b) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (a), but the agency shall not arrest the person for using force unless it determines that there is probable cause for the arrest.

"(c) A county or district attorney or other prosecutor may commence a criminal prosecution upon a determination of probable cause."

In this case, questions of the application of the statute arose after an information and complaint were filed, a summons was issued, and a detached magistrate found probable cause at Ultreras' first appearance. Hence, procedurally, the case had moved past the stages of prosecution addressed in K.S.A. 21-3219(b) (arrest) and K.S.A. 21-3219(c) (commencing a criminal prosecution). Ultreras, therefore, was seeking immunity from continued prosecution, apparently based on the last sentence of K.S.A. 21-3219(a) that defines "criminal prosecution" to include "charging or prosecution of the defendant."

He argues that once he raised the issue of immunity under K.S.A. 21-3219 it became the State's burden to prove that his use of force was not justified. The State argues that a probable cause determination related to the prosecution had been repeatedly made—by the prosecutor before filing the case and by the magistrate who authorized the issuance of a summons. Regarding the first of these determinations, the State suggests that K.S.A. 21-3219(c), which allows a prosecutor to prosecute upon a determination of probable cause, merely incorporates the well-established burden on the State to make a probable cause determination before starting a criminal prosecution. See Kansas Rules of Professional Conduct (KRPC) 3.8 (2012 Kan. Ct. R. Annot. 602) ("The prosecutor in a criminal case shall: [a] refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause."). Regarding the second finding of probable cause, K.S.A. 22-2302 requires a magistrate to find probable cause before issuing a warrant or summons. Accordingly, the State contends the legislature must have intended that the probable cause determination in K.S.A. 21-3219 already include a finding that the defendant's use of force was not justified because, otherwise, subsection (c) would be useless or redundant. See State v. McElroy, 281 Kan. 256, 263, 130 P.3d 100 (2006) ("it is presumed that the legislature does not intend to enact useless or meaningless legislation"). Once the probable cause determination is made, the State argues that

the burden then shifts to the defendant to challenge that decision by filing a motion to dismiss, which should be granted if the defendant shows by a preponderance of the evidence that his or her use of force was justified.

Ultreras responds that such an interpretation of subsection (c) is "absurd" because the State's discretion about whether to prosecute exists regardless of the statute. He urges this court to view the statute as providing additional protection for persons justified in the use of force. Specifically, he contends that the only way the statute makes sense is by placing the burden on the party seeking to overcome immunity before subjecting the party seeking immunity to further prosecution.

*Case Authority*

As the parties point out, there has been only one opinion issued in this jurisdiction addressing K.S.A. 21-3219, *McCracken v. Kohl*, 286 Kan. 1114, 1120, 191 P.3d 313 (2008), and it is of little assistance to the analysis of the issues presented in this appeal. In that case, McCracken had been charged and had received a preliminary hearing before he filed a writ of habeas corpus claiming he was immune from criminal prosecution under K.S.A. 21-3219. The State filed a motion to dismiss the writ, arguing that a habeas petition under K.S.A. 60-1501 was an improper method for raising the immunity claim because it was a collateral attack on the outcome of the preliminary hearing. The State asserted that the defendant's claim of immunity must be raised prior to the judicial determination of probable cause. The district court denied the State's motion and concluded that the writ of habeas corpus was both proper and timely. Nevertheless, after holding an evidentiary hearing, the district court concluded that McCracken had failed to meet his burden to prove by a preponderance of the evidence that he qualified for immunity under K.S.A. 21-3219.

This court, on direct appeal, declined to address the district court's denial of the State's motion to dismiss regarding the appropriateness of the procedural aspects of the case—that is, the use of the K.S.A. 60-1501 motion to claim immunity and the timing for filing an immunity claim—because the State had failed to file

a cross-appeal raising those issues. *McCracken*, 286 Kan. at 1119-20. Significant to our consideration, the *McCracken* court noted: "[W]e have not been presented with any challenge to K.S.A. 21-3219. Therefore, we do not offer any opinion on the statute's provisions or the burden of proof anomalies which it might create." *McCracken*, 286 Kan. at 1120. The court "narrowly restrict[ed]" its decision to the issue as presented by the parties that incorporated, without argument, a preponderance of the evidence standard. *McCracken*, 286 Kan. at 1120.

Consequently, this court has not addressed the burden of proof issues regarding which party has the burden of production or determined what standard of proof applies when a defendant seeks immunity under K.S.A. 21-3219 from continued prosecution of a pending criminal case. (For a note on terminology, see *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 100 n.4, 131 S. Ct. 2238, 180 L. Ed. 2d 131 [2011] [discussing "burden of proof" and distinguishing "burden of persuasion" that "specif[ies] which party loses if the evidence is balanced," "burden of production" that "specif[ies] which party must come forward with evidence at various stages in the litigation," and "standard of proof" that specifies the " 'degree of certainty by which the factfinder' " or a reviewing court must be persuaded by the party bearing the burden of production]; *State v. Ward*, 292 Kan. 541, 562, 567-69, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012].)

Courts in three other states, applying similar statutes, have addressed these questions; however, the results have not been uniform. The Colorado Supreme Court, whose decision was relied upon by the district court in this case, and the Florida appellate courts have held a defendant carries the burden of persuasion and must establish by a preponderance of the evidence that the use of force *was* lawful. On the other hand, the Kentucky Supreme Court has imposed the burden on the prosecutor to establish probable cause that the use of force *was not* lawful. A discussion of the rationale of these cases is helpful to our analysis.

The earliest decision is *People v. Guenther*, 740 P.2d 971 (Colo. 1987). The Colorado Supreme Court began its analysis by acknowledging that the Colorado Constitution prohibits allocating to a de-

fendant the burden of proving an affirmative defense at trial. The court held that this rule did not apply to Colorado's immunity from prosecution provisions found in Colo. Rev. Stat. § 18-1-704.5(3) (1986), which provided: " 'Any occupant of a dwelling using physical force, including deadly physical force, in accordance with the provisions of subsection (2) of this section shall be immune from criminal prosecution for the use of such force.' " *Guenther*, 740 P.2d at 974. Unlike the Kansas statute, the Colorado statute does not impose a probable cause—or any other—standard for arrest or prosecution. In determining that a defendant should bear the burden of production in establishing that this immunity applied, the Colorado Supreme Court noted:

"There is a constitutionally significant difference in kind between requiring a defendant, on the one hand, to bear the burden of proving a claim of pretrial entitlement to immunity from prosecution and, on the other, to carry the burden of proof at trial on an affirmative defense to criminal charges. Section 18-1-704.5(3) creates a benefit to a defendant far greater than an affirmative defense. If the statute is found to apply to the facts of the case, it will completely prohibit any further prosecution of charges for which, but for the statute, the defendant would otherwise be required to stand trial." *Guenther*, 740 P.2d at 980.

Given the extraordinary nature of the remedy, the Colorado Supreme Court concluded it was "reasonable to require the accused to prove his entitlement to an order of dismissal on the basis of statutory immunity." *Guenther*, 740 P.2d at 980. The court noted that a criminal defendant usually bears the burden of establishing his or her entitlement to dismissal of criminal charges at the pretrial stage of a case and concluded it was appropriate to impose the same burden when a defendant claimed justified use of force immunity. The Colorado Supreme Court also noted that "the accused presumably has a greater knowledge of the existence or nonexistence of the facts which would call into play the protective shield of the statute and, under these circumstances, should be in a better position than the prosecution to establish the existence of those statutory conditions which entitle him to immunity." *Guenther*, 740 P.2d at 980.

In determining the standard of proof to be imposed on the defendant, the Colorado Supreme Court weighed the relative merits

of a reasonable doubt and a preponderance of the evidence standard; there was no mention of a probable cause standard. The court chose the preponderance standard because it was used if a defendant filed other pretrial motions and a less rigorous standard was consistent with the expressed legislative intent of ensuring that citizens were afforded maximum safety in their own homes. *Guenther*, 740 P.2d at 980-81; see *People v. Janes*, 982 P.2d 300, 302 (Colo. 1999).

The Florida Court of Appeal relied heavily on the *Guenther* decision in *Peterson v. State*, 983 So. 2d 27 (Fla. Dist. App. 2008), even though the Florida justified use-of-force immunity statute, Fla. Stat. § 776.032 (2006), differs from the Colorado statute. The Florida statute includes a provision that is almost identical to K.S.A. 21-3219(a). In addition, the Florida statute includes a second subsection that is similar to K.S.A. 21-3219(b). Subsection (2) of the Florida statute provides that "[a] law enforcement agency may use standard procedures for investigating the use of force as described in subsection (1), but the agency may not arrest the person for using force unless it determines that there is probable cause that the force that was used was unlawful." Fla. Stat. § 776.032(2). The Florida statute does not include a provision similar to K.S.A. 21-3219(c), which the State relies upon in this case.

Citing *Guenther*, the Florida Court of Appeal held it was the defendant's burden to show how the immunity attaches by a preponderance of the evidence. *Peterson*, 983 So. 2d at 29. Once that burden has been met, the trial court may dismiss the action even where issues of material fact remain disputed. 983 So. 2d at 29-30 (trial court must weigh the factual disputes and may not deny a motion simply because those disputes exist). That holding was a departure from Florida's more general rules of criminal procedure, which required the denial of a motion to dismiss if there were disputed material facts. See Fla. R. Crim. Proc. 3.190(b), (c)(4). In addition, the court noted that a pretrial denial of a defendant's motion did not preclude the defendant from raising statutory immunity as an affirmative defense at trial. *Peterson*, 983 So. 2d at 29.

Subsequently, in *Dennis v. State*, 51 So. 3d 456 (Fla. 2010), the Florida Supreme Court approved the Florida Court of Appeal's procedural holding in *Peterson* that allowed a pretrial evidentiary hearing on a motion to dismiss and rejected the State's contention that the pretrial hearing on immunity should test whether the State has probable cause to believe the defendant's use of force was not legally justified. The Florida Supreme Court noted that before passage of Florida's immunity provision the law already required a pretrial nonadversarial probable cause determination by a judge, either before or shortly after a defendant was taken into custody. Hence, the court reasoned that a probable cause standard would make the grant of immunity meaningless. "Accordingly, the grant of immunity from 'criminal prosecution' in section 776.032 must be interpreted in a manner that provides the defendant with more protection from prosecution for a justified use of force than the probable cause determination previously provided to the defendant by rule." *Dennis*, 51 So. 3d at 463.

On the other hand, the Kentucky Supreme Court came to the opposite conclusion regarding the burden of production and the standard of proof that apply under that state's immunity provision. In *Rodgers v. Com.*, 285 S.W.3d 740 (Ky. 2009), the court extensively analyzed the relevant Kentucky statute, which is almost identical to the Florida statute. At trial, Rodgers had relied on *Guenther* to argue he was entitled to a pretrial evidentiary hearing where he would have the burden to prove by a preponderance of the evidence that his use of deadly force was justified. The court rejected the argument, finding that the defendant was not entitled to dismissal based on the immunity provision because there were disputed material facts regarding justification.

The *Rodgers* court rejected most of *Guenther*'s analysis but did conclude that the statute "in effect creates a new exception to the general rule that trial courts may not dismiss indictments prior to trial" because the legislature "has made unmistakably clear its intent to create a true immunity, not simply a defense to criminal charges. This aspect of the new law is meant to provide not merely a defense against liability, but protection against the burdens of prosecution and trial as well." *Rodgers*, 285 S.W.3d at 753. The

Kentucky court concluded the legislature had clearly stated its intent to create an immunity from defending against criminal charges by defining "criminal prosecution" to include "charging or prosecuting" a defendant. *Rodgers*, 285 S.W.3d at 753; Ky. Rev. Stat. Ann. § 503.085(1) (Michie/Bobbs-Merrill 2006).

This meant, according to the Kentucky Supreme Court, that courts "may also be called upon to determine whether a particular defendant is entitled" to self-defense immunity. *Rodgers*, 285 S.W.3d at 754. But, the court noted that the only standard of proof mentioned in the statute is probable cause. Hence, "[r]egardless of who is addressing the immunity claim"—a law enforcement agency making an arrest decision, a prosecutor bringing charges or seeking an indictment, or a court—"the controlling standard of proof remains 'probable cause,'" which could not be established without a determination that the use of force was *not* justified. *Rodgers*, 285 S.W.3d at 754. The court explained:

"'[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' Just as judges consider the totality of the circumstances in determining whether probable cause exists to issue a search warrant, they must consider all of the circumstances then known to determine whether probable cause exists to conclude that a defendant's use of force was unlawful. If such cause does not exist, immunity must be granted and, conversely, if it does exist, the matter must proceed." *Rodgers*, 285 S.W.3d at 754-55.

The Kentucky Supreme Court also concluded a defendant should be able to invoke the immunity provision "at the earliest stage of the proceeding" because it was "designed to relieve a defendant from the burdens of litigation." *Rodgers*, 285 S.W.3d at 755. In setting out the procedure to be followed, the court directed that once a defendant raises the issue of immunity, the State has the burden to establish probable cause "and it may do so by directing the court's attention to the evidence of record including witness statements, investigative letters prepared by law enforcement officers, photographs and other documents of record." *Rodgers*, 285 S.W.3d at 755. The *Rodgers* court declined to accept the defendant's argument that he should be allowed to use a procedure like the one approved in *Guenther*. The court reasoned:

"Although Rodgers advocates an evidentiary hearing at which the defendant may counter probable cause with proof 'by a preponderance of the evidence' that the force was justified, this concept finds no support in the statute. The legislature did not delineate an evidentiary hearing and the only standard of proof against which a defendant's conduct must be measured is the aforementioned probable cause. We decline to create a hearing right that the statute does not recognize. . . ." *Rodgers*, 285 S.W.3d at 755.

The *Rodgers* court then distinguished *Guenther* based on the fact that the Colorado provision related only to home invasion cases and did not define immunity from criminal prosecution as beginning with arrest. Because of this, the *Rodgers* court concluded that *Guenther* addressed a far more limited immunity, evaluated only by the courts, and implied that the burden of proof required by the Colorado statute was different than the probable cause standard in Kentucky. *Rodgers*, 285 S.W.3d at 755-56.

*Rodgers* also reasoned that other types of pretrial hearings—such as suppression hearings or competency proceedings—were distinguishable because they did not involve proof of the crime charged but instead dealt with ancillary issues such as search and seizure requirements and competency issues. *Rodgers*, 285 S.W.3d at 755. The court noted that placing the burden on the defendant to prove immunity would create a minitrial and would result in the case being determined in a bench trial. *Rodgers*, 285 S.W.3d at 755 ("In RCr 9.26 this Court has evinced its strong preference for jury trials on all elements of a criminal case by providing specifically that even if a defendant waives a jury trial in writing, the court and the Commonwealth must consent to a bench trial.").

*Analysis*

As we begin our analysis of K.S.A. 21-3219, we observe, as did the Colorado, Florida, and Kentucky courts, that immunity statutes like K.S.A. 21-3219 provide little guidance as to the procedural aspects of how to apply them. Thus, it is understandable that the district court in this case would look to the decisions in other jurisdictions and apply Colorado's analysis. Nevertheless, our study of these cases and a comparison of those states' statutes to Kansas' statute lead us to conclude that the probable cause standard rationale in *Rodgers* and its requirement that the prosecution carry

the burden of production is more consistent with the rules of statutory interpretation that are used in Kansas.

A basic tenet of those rules is that the intent of the legislature governs if it can be ascertained. To divine legislative intent, a court begins by examining and interpreting the language the legislature used. Only if that language is ambiguous does a court rely on any revealing legislative history, background considerations that speak to legislative purpose, or canons of statutory construction. Generally, a court should not read language into a provision. *Brown*, 295 Kan. 181, Syl. ¶ 5; *Stewart Title*, 294 Kan. at 557.

Applying those considerations to the language used by the legislature in K.S.A. 21-3219, the only standard of proof referenced in K.S.A. 21-3219 is to the standard of probable cause. To impose a preponderance of the evidence standard, we would have to add words to the statute. We recognize that both the Colorado and Florida Supreme Courts chose to do so, but we conclude the reasoning of those courts is not persuasive in light of the differences in those states' statutes as compared to the Kansas statute. In Colorado's circumstance, it is not surprising that the Colorado Supreme Court found it necessary to add a standard of proof because the Colorado statute, unlike the one in Kansas, makes no mention of any standard. The Florida statute, like the Kansas statute, does refer to a probable cause standard, but only in reference to an arrest; it does not include language like that found in K.S.A. 21-3219(c) providing that a "prosecutor may commence a criminal prosecution upon a determination of probable cause." With no mention of the standard for initiating a prosecution, the Florida court felt the need to specify one and, in doing so, employed a commonly recognized rule of statutory construction that legislation should not be interpreted in a way that makes it meaningless. *Dennis*, 51 So. 3d at 463; see *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 631, 132 P.3d 870 (2006) (" 'There is a presumption that the legislature does not intend to enact useless or meaningless legislation.' "). In contrast to the Florida statute, however, K.S.A. 21-3219(c) attaches the probable cause standard to the prosecution of a criminal case. Given that legislative direction, it is not necessary for us to guess at what the legislature may have intended.

In addition, contrary to the situation in Florida, applying a probable cause standard in Kansas does not mean that K.S.A. 21-3219 is useless. Generally, a detached Kansas magistrate considering whether to issue a warrant or summons merely determines "that there is probable cause to believe both that a crime has been committed and that the defendant has committed it." K.S.A. 22-2302(1). Under K.S.A. 21-3219, however, once a defendant raises justified use-of-force immunity before a court, a probable cause determination must also include a determination that the defendant's use of force was not justified under K.S.A. 21-3211, K.S.A. 21-3212, or K.S.A. 21-3213. Hence, the statute as written with a probable cause standard adds an additional requirement and is meaningful. Consequently, we find no justification to add language not adopted by the Kansas Legislature.

Likewise, K.S.A. 21-3219 does not refer to a burden on a defendant; the statute—specifically K.S.A. 21-3219(b) and (c)—imposes a burden on a law enforcement agency before arrest and on a prosecutor before initiating a prosecution. The plain language infers that the prosecutor should maintain that burden in prosecuting a defendant. It would be contrary to the language of K.S.A. 21-3219(b) and (c) to impose a burden of production on a defendant to prove immunity before arrest or even before prosecution. As a practical matter, a defendant who was entitled to statutory protection from arrest or prosecution would never be able to obtain that benefit. Such a result would be unreasonable—a consequence we must avoid in construing a statute. See *State v. Trautloff*, 289 Kan. 793, 797, 217 P.3d 15 (2009) (courts should construe statutes to avoid unreasonable results). Further, requiring the State to maintain the burden of production is consistent with the burden of production that applies when the issue of justified force is raised as a defense at trial. See *State v. Cooperwood*, 282 Kan. 572, 582, 147 P.3d 125 (2006) (While the defendant must raise the affirmative defense, the State remains burdened to prove the crime beyond a reasonable doubt.). Evidence of justification simply becomes a consideration in deciding whether the State has met that burden. To impose the burden on the defendant would carve one portion of the proceeding from the general requirement that the

State carry the burden of production and that carving would result in a confusing situation of shifting burdens and is not justified by the provisions of the statute. Accordingly, we find that placing the burden with the State to negate a claim of immunity in establishing probable cause is the most reasonable interpretation.

In summary, we find that the standard of proof for whether a defendant is entitled to immunity from criminal prosecution under K.S.A. 21-3219 is probable cause. We further find that the State bears the burden of establishing proof that the force was not justified as part of the probable cause determination required under K.S.A. 21-3219(b) and (c). Because those questions are not before us, we reach no holdings regarding the procedures by which the immunity defense should be presented to or resolved by the district court.

*Harmless Error*

Based on our holding, the district court in this case erred by imposing the burden of production on Ultreras and by imposing a higher standard of proof than probable cause. Ultreras also argues that the district court erred in failing to recognize that he did not have a duty to retreat and in weighing the facts. We need not discuss these last two claims of error because we conclude that even if the district court erred in all aspects of the immunity ruling, the error was harmless.

We agree with the Florida Supreme Court's holding in *Dennis* that the application of an erroneous standard and burden of proof when ruling on a motion to dismiss that is based on a claim of immunity may be harmless error. *Dennis*, 51 So. 3d at 463; see generally *Ward*, 292 Kan. 541. Because the claimed error was in application of a statutory right, under the harmless error test of K.S.A. 60-261 and K.S.A. 60-2105, an appellate court must be persuaded there is no reasonable probability the error affected the outcome of the trial in order to find the error harmless. *Ward*, 292 Kan. at 564-65.

In weighing the impact of the error under Florida's harmless error standard, the *Dennis* court noted that the trial court's pretrial ruling did not limit the defendant's ability to present his claim of

self-defense at trial or otherwise cause the trial to be unfair. Nor was there any indication the evidence in a pretrial proceeding would have been different from the evidence presented at trial. Rather, the issue of self-defense was fully litigated at trial, allowing the jury to weigh all available evidence. Based on that evidence, the jury rejected the defendant's self-defense arguments and determined beyond a reasonable doubt that the defendant was guilty. In light of those considerations, the court deemed the error harmless. *Dennis*, 51 So. 3d at 464.

For the same reasons, we conclude the error in this case was harmless. In addition, Ultreras has not argued that there were errors in the jury instructions or suggested any reason to conclude the jury did not appropriately consider justified use of force. Yet, in applying the evidence in light of the jury instructions, the jury rejected Ultreras' arguments and found him guilty beyond a reasonable doubt. This verdict is supported by substantial evidence that would allow a juror to conclude that Ultreras' use of force was unreasonable. See K.S.A. 21-3211(a) ("A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force."). Gonzales-Urbina testified he was awakening from a state of unconsciousness when Ultreras hit him. Urbina testified he repeatedly said he would remove his brother from the premises but was still attacked, and Mendoza testified he had not been involved in the fight and was standing in the middle of the street away from the altercation on the sidewalk when Ultreras approached him and hit him with the metal baton.

Thus, the record supports a determination that the State offered evidence sufficient for a person of "ordinary prudence and caution to conscientiously entertain a reasonable belief" of Ultreras' guilt despite his claim of justified use-of-force immunity. See *State v. Puckett*, 240 Kan. 393, 395, 729 P.2d 458 (1986) (stating probable cause standard). There was nothing offered at the preliminary hearing, the hearing on the motion for immunity, or the trial that undermined a finding of probable cause. Because the evidence presented by the State meets the probable cause standard, Ultreras

was not entitled to immunity from prosecution afforded by K.S.A. 21-3219, and any error in the imposition of an erroneous standard and burden of proof or in the district court's application of a justified use-of-force defense, including potentially failing to recognize that under K.S.A. 21-3218 Ultreras did not have a duty to retreat, was harmless.

### SUFFICIENT EVIDENCE OF ALTERNATIVE MEANS

Next, Ultreras argues his aggravated battery convictions in count I—for recklessly causing great bodily harm to or disfigurement of Mendoza under K.S.A. 21-3414(a)(2)(A)—and count III—for recklessly causing bodily harm to Urbina with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death could be inflicted under K.S.A. 21-3414(a)(2)(B)—must be reversed because the evidence was insufficient to support a finding of guilt on each of the alternative means for committing the crimes on which the jury was instructed. To support his argument, Ultreras cites *State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010), and *State v. Timley*, 255 Kan. 286, 875 P.2d 242 (1994).

In *Timley*, the court established what we have referred to as the alternative means rule and its corollary super-sufficiency requirement when it held: " '[W]here a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means.' " *Timley*, 255 Kan. at 289 (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]). More recently, in *Wright*, this court explained that the *Timley* alternative means rule/super-sufficiency requirement "is the only choice to ensure a criminal defendant's statutory entitlement to jury unanimity." *Wright*, 290 Kan. at 206.

Although Ultreras demands application of the alternative means rule, he does not cite any authority for the proposition that the legislature included alternative means of committing aggravated battery within K.S.A. 21-3414(a)(2)(A) or K.S.A. 21-3414(a)(2)(B). Recently, in *State v. Brown*, 295 Kan. 181, 284 P.3d 977 (2012), we clarified that an appellate court's first task when faced with an

alternative means/super-sufficiency argument is to analyze whether alternatives in a jury instruction define material elements of a crime in a distinct—meaning separate or different—manner. Only then do the alternatives state alternative means of committing the crime. *Brown*, 295 Kan. at 189-90. We have not applied the *Brown* analytical framework to K.S.A. 21-3414. *Cf. State v. Kelly*, 262 Kan. 755, 942 P.2d 579 (1997) (considering alternative means arguments under prior version of K.S.A. 21-3414 that varied in wording and structure from version in effect at time of Ultreras' crimes).

In *Brown*, we emphasized that "[i]dentifying an alternative means statute is more complicated than spotting the word 'or'" because "'[t]he mere use of a disjunctive in a statute does not an alternative means crime make.'" *Brown*, 295 Kan. at 193 (quoting *State v. Peterson*, 168 Wash. 2d 763, 770, 230 P.3d 588 [2010]). We further explained that in determining whether the legislature defined alternative material elements, a court examines if the legislature has prohibited distinct alternative acts, omissions, or possessions—the *actus reus* element—or distinct alternative states of mind that a defendant must have when committing the act, omission, or possession—the *mens rea* element. In some crimes, the legislature may also state a causation element by defining the harm or result that must arise from a defendant's act or omission and may state distinct alternatives. *Brown*, 295 Kan. at 195 (citing K.S.A. 2011 Supp. 21-5201[a]; K.S.A. 2011 Supp. 21-5202[a]; *Peterson*, 168 Wash. 2d at 771-72). The crime of battery, as it is typically defined, is a crime that includes a causation element. See Black's Law Dictionary 162 (8th ed. 2004).

If the legislature has created alternatives as to any one or more of these material elements of the crime, it has created alternative means. *Brown*, 295 Kan. at 194-95. If, however, the legislature has stated alternatives that merely describe or define a material element or a factual circumstance that would prove the crime, these are secondary matters that state options within a means rather than alternative means subject to the super-sufficiency requirement. *Brown*, 295 Kan. at 194, 196-99.

In *Brown*, we discussed some guideposts for determining whether the legislature intended to create alternative means, as

opposed to merely options within a means. We noted that in conducting this analysis and determining the legislature's intent, ordinary rules of statutory construction apply. *Brown*, 295 Kan. at 193-94. In addition, "[t]ypically, . . . a legislature will signal its intent to state alternative means through structure, separating alternatives into distinct subsections of the same statute." *Brown*, 295 Kan. at 196 (citing *State v. Smith*, 159 Wash. 2d 778, 784-86, 154 P.3d 873 [2007]). "Regardless of such subsection design, however, a legislature may list additional alternatives or options within one alternative means of committing the crime." *Brown*, 295 Kan. at 196. For further guidance on how to analyze when those additional options are alternative means as opposed to options within a means, we looked to the caselaw of the State of Washington after noting that our alternative means caselaw was based on a similar super-sufficiency requirement imposed by the courts in that state. The Washington courts have determined that options do not state alternative means if the language merely (a) defines other statutory language in a way that elaborates on or describes a material element or (b) describes factual circumstances that prove the crime. *Brown*, 295 Kan. at 198-200.

With these guidelines in mind, it is helpful to look at the structure of K.S.A. 21-3414 before examining the specific language of subparagraphs (a)(2)(A) and (a)(2)(B). K.S.A. 21-3414 states:

"(a) Aggravated battery is:

(1)(A) Intentionally causing great bodily harm to another person or disfigurement of another person; or

(B) intentionally causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

(C) intentionally causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

(2)(A) recklessly causing great bodily harm to another person or disfigurement of another person; or

(B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted."

The structure of the statute signals that the legislature has defined at least five alternative means of aggravated battery. The five

alternatives are divided into two subsections based on alternative, distinct mental states, with subparagraph (1) requiring proof that the defendant acted intentionally and subparagraph (2) requiring proof that the defendant acted recklessly. See K.S.A. 21-3414; *State v. O'Rear*, 293 Kan. 892, 896, 270 P.3d 1127 (2012). Subparagraphs (1) and (2) are divided into subparts with the causation element— the nature or severity of harm that results from defendant's action—being the gravamen of each subpart and the feature distinguishing one subpart from another.

There is language in each subpart that expands beyond these basic elements, however, and the questions posed by Ultreras demand that we examine whether this additional language creates distinct elements or merely states options within a means.

*Count I and K.S.A. 21-3414(a)(2)(A)*

As to count I, Ultreras argues K.S.A. 21-3414(a)(2)(A) states alternative means by using the phrase "great bodily harm to another person *or* disfigurement of another person." (Emphasis added.) We disagree because "disfigurement" is merely a factual circumstance by which "great bodily harm" can be proved.

This court has summarized cases regarding the meaning of the phrase "great bodily harm of another or disfigurement" by stating:

"[T]he term 'great' distinguishes the bodily harm necessary from slight, trivial, minor, or moderate harm, and does not include mere bruising, which is likely to be sustained by simple battery. *State v. Dubish*, 234 Kan. 708, 715, 675 P.2d 877 (1984); *State v. Sanders*, 223 Kan. 550, 552, 575 P.2d 533 (1978). The same is true with regard to 'disfigurement.' 'Disfigurement' has no single technical meaning or single definition and should be considered in the ordinary sense. *State v. Chandler*, 252 Kan. 797, 804, 850 P.2d 803 (1993)." *State v. Moore*, 271 Kan. 416, 419, 23 P.3d 815 (2001), *disapproved of on other grounds by State v. Brice*, 276 Kan. 758, 80 P.3d 1113 (2003).

While this informs us that the term "great" means the harm or disfigurement cannot be slight, trivial, minor, or moderate, and that disfigurement does not have a single definition, it does not define "bodily harm." We cannot look to statutes to supply the definition because the legislature did not include a definition in either the aggravated battery statute, the statute defining terms in the criminal code, or in the many other statutes using the term. See *Paida*

*v. Leach*, 260 Kan. 292, 299-300, 917 P.2d 1342 (1996) (construing Protection from Abuse Act, K.S.A. 60-3101 *et seq.*, and citing dictionary definitions, including Black's Law Dictionary's definition, of "serious bodily injury" in absence of statutory definition of "bodily injury"); *State v. Brown*, 181 Kan. 375, 389, 312 P.2d 832 (1957) (in absence of statutory definition of "bodily harm" in G.S. 1949, 21-449, which defined the elements of aggravated kidnapping, defining phrase 'to mean "any touching of a victim against [the victim's] will, with physical force, in an intentional, hostile and aggravated manner, or the projecting of such force against the victim by the kidnaper"); see also *State v. Sanders*, 225 Kan. 156, 158-59, 587 P.2d 906 (1978) (applying definition from *Brown*); *State v. Taylor*, 217 Kan. 706, 713-15, 538 P.2d 1375 (1975) (same).

In the absence of a statutory definition for the phrase "great bodily harm" in the aggravated battery statute, the rules of statutory construction direct us to apply the terms' ordinary meaning because the phrase "great bodily harm" consists of common words. See *State v. Raschke*, 289 Kan. 911, 914, 219 P.3d 481 (2009) (The first step in ascertaining legislative intent is to examine the statutory language, "giving ordinary words their ordinary meanings."). Hence, as this court did in *Paida*, we turn to Black's Law Dictionary, where the editors list the definition under an entry for "serious bodily injury," noting that phrase is synonymous with "serious bodily harm," "grievous bodily harm," and "great bodily injury." Black's Law Dictionary 802 (8th ed. 2004); see *Paida*, 260 Kan. at 300 (noting that "harm" is synonymous with "injury"). Black's Law Dictionary 802 (8th ed. 2004) defines "serious bodily injury" to mean "[s]erious physical impairment of the human body; esp., bodily injury that creates a substantial risk of death or causes serious, permanent *disfigurement* or protracted loss or impairment of the function of any body part or organ." (Emphasis added). This definition of the phrase suggests that the use of disfigurement in K.S.A. 21-3414 merely describes a factual circumstance that proves great bodily harm.

We discussed a similar definition in *Brown*, 295 Kan. at 199. There, we noted words describing a factual circumstance that proves a statutory element are options within a means and not

alternative means, and, in doing so, we looked to Washington case-law to provide an example. We observed that the Washington Court of Appeals had applied the guideline in *State v. Laico*, 97 Wash. App. 759, 987 P.2d 638 (1999), while discussing a statute that defined first-degree assault as the act of assault that "inflicts great bodily harm.' " *Laico*, 97 Wash. App. at 762 (quoting Wash. Rev. Code § 9A.36.011[1][c] [1999]). Washington had another statute that defined "great bodily harm" as " 'bodily injury which creates a probability of death, or which causes significant serious permanent *disfigurement*, or which causes a significant permanent loss or impairment of the function of any bodily part or organ.' " (Emphasis added.) *Laico*, 97 Wash. App. at 762 (quoting Wash. Rev. Code § 9A.04.110[4][c] [1999]).

In explaining the *Laico* decision, we stated:

"In *Laico*, the Washington Court of Appeals explained that the Washington assault statute's description of 'great bodily harm' to include ' "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ" ' did not raise an alternative means issue when it was incorporated into a jury instruction. *Laico*, 97 Wash. App. at 762. These alternate factual circumstances, the court reasoned, are 'merely descriptive of a term that constitutes, among other things, an element of the crime of first degree assault.' *Laico*, 97 Wash. App. at 763." *Brown*, 295 Kan. at 199.

The *Laico* court's analysis, which was subsequently approved by the Washington Supreme Court in *Smith*, 159 Wash. 2d at 788, was based, in part, on the Washington Supreme Court's guideline that definitions stated in a separate statute from an elements statute typically do not state alternative means. The Kansas statute does not have this separate definitional provision. Nevertheless, given that the common meaning of the phrase "great bodily harm" includes "disfigurement," we conclude the term "disfigurement" merely describes a factual circumstance that proves great bodily harm and, as such, is an option within a means and not an alternative means.

Consequently, the super-sufficiency requirement does not apply to the alternatives stated in K.S.A. 21-3414(a)(2)(A), and Ultreras' argument that the State failed to prove sufficient evidence of a

violation of that provision fails. Ultreras concedes in his brief that Mendoza suffered great bodily harm. Clearly, a reasonable juror could conclude that Mendoza suffered great bodily harm because he suffered an injured right testicle that required months of medical treatment and surgery to remove a mass caused by Ultreras' hitting Mendoza with a metal baton. See *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012) (reviewing sufficiency of evidence requires examination of evidence in light most favorable to prosecution and determination of whether a rational factfinder could find defendant guilty beyond a reasonable doubt).

*Count III and K.S.A. 21-3414(a)(2)(B)*

Next, Ultreras raises a super-sufficiency argument regarding his conviction for the crime alleged in count III—recklessly causing bodily harm to Urbina with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, or death could be inflicted under K.S.A. 21-3414(a)(2)(B). The gravamen of this offense is the level of harm caused under the specified circumstances. Ultreras argues these circumstances state two alternatives—one through the phrase "with a deadly weapon" and a second through the phrase "in any manner whereby great bodily harm, disfigurement or death can be inflicted."

The initial appeal of this argument evaporates in light of the fact that the phrase "causing bodily harm to another person with a deadly weapon" is synonymous with the phrase "causing bodily harm to another person . . . in any manner whereby great bodily harm, disfigurement or death can be inflicted." The equivalency of the two phrases is revealed in the manner in which this court has defined "deadly weapon." For example, in *State v. Hanks*, 236 Kan. 524, 537, 694 P.2d 407 (1985), *superseded by statute on other grounds as stated in State v. Borthwick*, 255 Kan. 899, 916, 880 P.2d 1261 (1994), this court, in the context of an aggravated battery case, defined a deadly weapon as "an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury." In other words, a deadly weapon is an instrument that can inflict death or great bodily harm, which includes disfigurement. See *State v. Anderson*, 281 Kan. 896, 912,

136 P.3d 406 (2006) (in determining legislative intent, court can presume the legislature knows the law). Thus, the phrase "with a deadly weapon" describes a factual circumstance that proves bodily harm was caused in a "manner whereby great bodily harm, disfigurement or death can be inflicted" and, as such, is an option within a means rather than an alternative means.

Consequently, Ultreras' super-sufficiency argument fails. There was evidence that Ultreras used the baton in a manner calculated or likely to produce great bodily harm, disfigurement, or death. Urbina testified that Ultreras tried to hit him in the head, but Urbina raised his arm in defense and the baton hit his arm with sufficient force to cause a bump that was still present at the time of trial. The targeting of Urbina's head and the level of force with which the battery occurred present circumstantial evidence that Ultreras used the baton in a manner calculated or likely to inflict great bodily injury, disfigurement, or death. See *State v. Murdock*, 286 Kan. 661, 669-70, 187 P.3d 1267 (2008) (holding that eyewitness testimony stating the defendant had been wearing brass knuckles and the victim's testimony stating that he felt something hard and solid hit his head provided circumstantial evidence sufficient "that a rational factfinder could have found the defendant guilty of aggravated battery" when viewed in a light most favorable to the prosecution).

## Jury Unanimity

Ultreras claims the aggravated battery charge involving Urbina-Gonzales (count II) was predicated upon multiple acts because the State alleged he struck Urbina-Gonzales while inside the bar and while outside the bar, and his actions inside can be viewed as separate and distinct from those outside the bar. He argues this means there were multiple acts and the district court erred by failing to give a unanimity instruction for count II.

We have explained:

"In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). . . . In order to ensure jury unanimity as to the specific act for which the defendant is charged, the trial court must either require the State to elect the particular

criminal act upon which it will rely for the conviction or instruct the jury that all jurors must agree that the same underlying criminal act has been proven beyond a reasonable doubt. *State v. Voyles*, 284 Kan. 239, Syl. ¶ 2, 160 P.3d 794 (2007).

"In *Voyles*, this court set out a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine if the case truly involves multiple acts, *i.e.*, whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred, *i.e.*, whether there was a failure by the State to elect an act or a failure by the trial court to instruct. Third, the court must determine whether the error is reversible." *State v. Colston*, 290 Kan. 952, 961-62, 235 P.3d 1234 (2010).

Discussing the final step, the *Voyles* court determined that the "clearly erroneous" provision of K.S.A. 22-3414(3) should apply. *State v. Voyles*, 284 Kan. 239, 245-47, 160 P.3d 794 (2007). The *Voyles* court opined that a district court's failure to instruct on unanimity was reversible under the clearly erroneous standard unless the defendant had presented a unified defense or a general denial of all of the acts, specifically explaining:

"If there is no unified defense, we do not tolerate verdict uncertainty in these cases. Stated in the language of the clearly erroneous standard of review applicable when no unanimity instruction has been requested, cases not containing a unified defense are reversed because the reviewing court is firmly convinced that there is a real possibility the jury would have returned a different verdict if the instruction had been given." *Voyles*, 284 Kan. at 253.

Ultreras seeks to advance the unified defense question, which we have traditionally examined during the third step of the analysis, to a consideration impacting the first step of the analysis by arguing there were multiple acts because a juror could have believed Ultreras acted in defense of property while inside the bar and in defense of himself or others while outside the bar. He suggests the different motivations could lead to the conclusion that Ultreras acted with a different impulse inside the bar than outside. Fresh impulse is a factor traditionally considered in step one of the analysis—the question of whether there are multiple acts, *i.e.*, acts which are factually separate and distinct. See *State v. Kesselring*, 279 Kan. 671, 683, 112 P.3d 175 (2005). The full list of factors we use when determining whether there is unitary conduct or multiple

acts are whether: "(1) the acts occurred at or near the same time; (2) the acts occurred at the same location; (3) a causal relationship existed between the acts, in particular whether an intervening event separated the acts; and (4) a fresh impulse motivated some of the conduct." *State v. Sprung*, 294 Kan. 300, 307, 277 P.3d 1100 (2012); accord *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 (2006).

Although Ultreras suggests there was a fresh impulse, he concedes the incidents are otherwise not factually separate. Indeed, a review of the record shows that Ultreras' actions occurred at or near the same time, at the same location, and there was a causal relationship between the acts, which were part of an overall design or objective to remove Urbina-Gonzales from the premises. There is no evidence of a fresh impulse. See *State v. Bischoff*, 281 Kan. 195, 203, 131 P.3d 531 (2006) (noting that when individual acts are part of an overall "design or objective" they represent a continuing course of conduct). Bar employees other than Ultreras started physically moving Urbina-Gonzales toward the door and a "big wrestling match" ensued. This wrestling match continued past the bar area, and at that point Ultreras joined in with the metal baton. Ultreras' brother testified they tried to get Urbina-Gonzales out as quickly as possible, and one of the security guards testified they exited not long after they got to the door. All of the bar employees who testified indicated their objective was to move Urbina-Gonzales from inside the bar to outside the bar. Once outside, Ultreras' brother testified that Urbina-Gonzales was still trying "to throw a big ole fight." Thus, there was not a break in the action or an intervening act between the course of conduct inside and outside the bar. See *State v. Foster*, 290 Kan. 696, 714, 233 P.3d 265 (2010) (even though acts of criminal threat were interrupted by other criminal acts, this did not break causal relationship between them or demonstrate fresh impulses). The availability of both the defense of property and the defense of persons, at least under the facts of this case, does not present an interruption in the continuous course of conduct that suggests multiple acts.

Accordingly, we conclude Ultreras cannot meet the first requirement of the *Voyles* analysis for establishing multiple acts. Conse-

quently, we hold that the district court did not err when it did not give a unanimity instruction for the aggravated battery charge involving Urbina-Gonzales.

### OPPORTUNITY FOR CROSS-EXAMINATION

On the first morning of trial, Urbina and Urbina-Gonzales failed to appear as required by their subpoenas. When Ultreras sought to cross-examine the witnesses regarding their failure to honor the subpoenas, the district court refused to allow the testimony, concluding it was not relevant. Ultreras claims the evidence was relevant, his proposed questions were permissible under K.S.A. 60-420 as extrinsic evidence relevant to the witnesses' credibility, and the district court erred in refusing to allow the testimony.

The threshold determination for the admission of evidence in any proceeding is relevance. *State v. Riojas*, 288 Kan. 379, 382, 204 P.3d 578 (2009). Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish. *Riojas*, 288 Kan. at 383. Relevant evidence, as defined in K.S.A. 60-401(b), is "evidence having any tendency in reason to prove any material fact." In *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008), we explained that this definition of "relevance" contains both a materiality element and a probative element. There, we held that an appellate court reviews a district court's determination of materiality de novo and the assessment of probative value under an abuse of discretion standard. *Reid*, 286 Kan. at 508-09. Here, the district court's determination seems to have been based on finding that the evidence was not material.

Ultreras argues that evidence that the witnesses failed to honor a subpoena is material because a reluctance to testify or general disdain for lawful orders impairs a witness' credibility. The State contends there is no evidence in the record as to why they failed to honor the subpoena, nor is there any evidence indicating they were reluctant to testify. The State argues that the credibility of a witness should not be questioned simply because the State requested a material witness warrant.

We agree with Ultreras' argument that a failure to honor a subpoena, regardless of the reason, impacts a witness' credibility. The presence of reasonable explanations would impact the weight of the evidence—its probativeness—rather than its materiality. Accordingly, we conclude that the district court erred in denying Ultreras' request to question the witnesses as to why they failed to honor their subpoenas.

Typically, the next step of analysis regarding the admissibility of evidence is to apply the statutory rules controlling the admission and exclusion of evidence. *Riojas*, 288 Kan. at 383. In this case, however, other than the defendant's passing reference to K.S.A. 60-420, which indicates that admissibility under that provision is "[s]ubject to K.S.A. 60-421 and 60-422," the parties have provided no analysis. Given that, we likewise will not determine whether the district court's ruling may have been correct for a different reason because we conclude the error was harmless.

The parties did not discuss harmless error and, therefore, have not suggested which standard—the constitutional or the statutory harmless error standard—applies in this case. Again, we do not find a need to break this ground on our own because even if we apply the constitutional harmless error standard, which holds the State to the most rigorous burden and thus has the most potential of providing the defendant relief, we conclude the error was harmless. Under this standard, the State, as the party benefitting from the error, has the burden to establish beyond a reasonable doubt that the error "will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

We have previously stated that

" '[w]hether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the

prosecution's case.' " *State v. Atkinson*, 276 Kan. 920, 930, 80 P.3d 1143 (2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 [1986]).

Ultreras contends that exclusion of the credibility evidence was reversible error because the prosecution's case was built entirely on the credibility of the victims' testimony. Indeed, credibility was essential and the testimony might have damaged the victims' credibility, but that does not mean that evidence of a failure to abide by the subpoenas would have affected the outcome of the trial.

We conclude any damage would have been minimal for several reasons. First, Urbina's and Urbina-Gonzales' trial testimony regarding the events of the night in question was consistent with their testimony at the preliminary hearing and with their statements to law enforcement officers on the night of the incident. Second, the three victims provided consistent testimony about what occurred that night. Finally, defense counsel was allowed to cross-examine both Urbina and Urbina-Gonzales fully on all other areas of their testimony.

Given the nature of the excluded evidence and the testimony at trial, we hold that exclusion of the credibility testimony was harmless beyond a reasonable doubt. See *Ward*, 292 Kan. 541, Syl. ¶ 6.

Affirmed.