NOT DESIGNATED FOR PUBLICATION

No. 119,209

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

CRYSTAL K. ROTRAMEL,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed May 24, 2019. Affirmed.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Patrick H. Dunn*, Kansas Appellate Defender Office, for appellee.

Before HILL, P.J., BRUNS, J., and BURGESS, S.J.

PER CURIAM: The State of Kansas appeals from the district court's order granting Crystal K. Rotramel immunity from prosecution under K.S.A. 2018 Supp. 21-5231 and the dismissal of second degree intentional murder charges against her arising out of the death of Richard J. Hamm Jr. On appeal, the State contends that the district court erred in finding that it did not meet its burden of establishing probable cause that Rotramel's use of deadly force was not justified. In the alternative, the State argues that Rotramel was the aggressor. Finding that the district court's decision granting immunity to Rotramel is supported by substantial competent evidence, we affirm.

1

FACTS

On February 13, 2017, the State of Kansas charged Crystal Rotramel with one count of intentional second-degree murder in the shooting death of Richard Hamm Jr. In response, Rotramel filed a motion for immunity and requested a probable cause hearing on the issue on March 16, 2017. In her motion, Rotramel asserted that Hamm unlawfully entered her vehicle and placed her in fear of imminent death or great bodily harm. Thus, Rotramel argued that she was entitled to immunity from prosecution under K.S.A. 2018 Supp. 21-5231.

Nearly a year later, on February 27, 2018, an evidentiary hearing was held by the district court. The hearing served both as a preliminary hearing on the second-degree murder charge and a hearing on the motion for immunity. At the hearing, the State presented the testimony of 10 witnesses and 2 rebuttal witnesses. Rotramel testified in support of her motion. In addition, 15 exhibits were admitted including bodycam and dashcam videos and various photographs. At the end of the hearing, the district court granted leave for the parties to file supplemental written closing arguments.

On March 23, 2018, the district court entered a 10-page Memorandum Decision, granting Rotramel's "claim of immunity because the State has not carried its burden to establish probable cause that defendant's use of force was not statutorily justified." At the outset, the district court cited *State v. Hardy*, 305 Kan. 1001, 1011, 390 P.3d 30 (2017) for the proposition that it "must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that defendant's use of force was not statutorily justified." The district court then made 17 factual findings with citations to the record.

2

Specifically, the district court found the following "Essential Facts" based on the evidence presented at the hearing:

"1. The Defendant, Crystal L. Rotramel, and Richard Hamm began their relationship when she bonded him out of jail. She thought it was going to be a dream come true. (Tr., p. 165.)

"2. But, within weeks, Crystal L. Rotramel 'called the cops on him.' She explained that the relationship became extremely abusive. 'It went from him hitting me, back-handing me, kicking me, pushing me. He would even hold my breath. He held guns to my head multiple times. He threatened me. He threatened—told me by threatening to harm pretty much whoever I ran to.' (Tr., p. 165.)

"3. On the day of the incident, Crystal L. Rotramel decided to leave him. '[M]y way out was to go to an officer and provide him the evidence that he had told me, two days prior, to bring him, and that he would do a search warrant . . . my only way out was to get him to go to jail. He would have to go back to jail for him to leave me alone.' (Tr., p. 166.)

"4. She testified, 'I wanted to leave. I wanted to go make contact with this Officer Cruz, and I wanted to give him this jacket. I wanted him to issue a search warrant or whatever he needed to do, and I wanted [Hamm] to go to jail. I wanted to link him to a crime that had happened a week prior.' (Tr., p. 172.)

"5. While loading her belongings into the car Rotramel testified; 'I had to continue to shut the hatch because otherwise he would start throwing my stuff out. So every time I went out with a handful, I would have to unlock it, throw my stuff in, and then go back in to get more.' (Tr., p. I 67.)

"6. While loading the car, she testified, 'he would continuously hit me in the back and grab my neck, and then he, like, threw me down . . . he'd throw me to the ground continuously. He would forcefully hold me down, like, to where I was not able to leave.' (Tr., p. 168.)

3

"7. When asked if she intended for Richard Hamm to go with her, Rotramel testified, 'No, not at all.' (Tr., p. 172.) When asked, '[w]ere you trying to keep him out of your vehicle?,' she answered, 'Definitely, the whole time.' (Tr., p. 173.)

"8. Rotramel explained that the last item loaded in the car was the jacket referred to, above. She then testified, 'I had waited for the very last thing to grab the jacket because I knew if he knew I had the jacket, he was going to know something was up. I waited to see him cross through the kitchen, which you can't see, but—and then I just—I had the jacket already and I grabbed the gun, and I had ran right to the car. That's when he chased me out to the car.' (Tr., p. 173.)

"9. She explained how he got in the car, testifying; 'even though I only pushed the unlock button once, when the vehicle recognizes me having the key fob in my hand, it must have unlocked all of the doors because it unlocked his too.' After he got in, she testified, 'I was yelling for him to get out.' (Tr., p. 174.)

"10. As Rotramel sped off, she was waving the gun in the air 'to draw attention to anybody that would look at me just so that maybe they would call the cops.' (Tr., p. 174.)

"11. As Rotramel was driving, she described that, 'the whole time he was continuously pushing me, hitting me, yelling at me that he was going to throw me out.' (Tr., p. 175.)

"12. 'So the whole way there it is a complete mess within the vehicle with yelling and arguing and pushing and shoving. He continuously was trying to reach over and open my door and tell me he was going to throw me out. He was shoving me like he was trying to push me out. Hitting the back of my neck, pulling my hair. There was incidents where he had swerved the vehicle himself grabbing ahold of the wheel and swerving it, and I was driving it as fast as I could go. We were in a one-lane thing. But I just wanted anybody to call 911 or get to where I was going so I could get the help that I needed.' (Tr., pp. 175-176.)

"13. An observer, a Ms. Kimberly Scheer, who was in a vehicle just ahead of the Rotramel vehicle testified that she saw in her rear view mirror that the passenger in the Rotramel vehicle- Mr. Hamm-'lean[ed] all the way over to the point that I wondered what

4

they were doing, why they were leaning over there. It appeared to me that they were leaning over onto the driver.' (Tr., p. 35.)

"14. Just moments after the shooting, while seated in a law enforcement vehicle, the defendant made a spontaneous statement recorded in Exhibit I, an MVR video/audio recording, recorded by Deputy Maness:

> (5: 18) 'We had been fighting. I had packed all of my shit and he wouldn't let me out of the house; and he kept holding me hostage.' A few seconds later in the recording, the defendant commented that Mr. Hamm said (5:59): 'I'm going to throw you out of the fuckin car if you throw my shit out of the car.' She explained, 'Cause I threw it out of the car. And then I did a U-tum right there because he was telling me I better go back and get it, otherwise he was going to throw me out of the car. My first response was to just grab the gun because he was going to try to throw me out . . . I don't know . . . I don't know how it went off . . . I don't know.' State's Exhibit I.

"15. When asked if she recalled when the gun went off, Ms. Rotramel testified: 'I don't . . . the last thing I remember was he had ahold of my hair and that's the last thing I remember.' (Tr., p. 178.)

"16. When asked if she threatened to shoot him 'if he didn't leave [her] alone,' she answered, 'I did. I don't know my exact words; but somewhere along the lines of, leave me alone or I will use this . . . .' (Tr., p. 178.)

"17, She added, 'I did not intend to hurt anybody. I was just fearful for my life. It was mine or his.' (Tr., p. 178.)"

After making these factual findings, the district court reviewed the applicable statutes and caselaw. In doing so, the district court concluded that "the State has not carried its burden to establish probable cause that [Rotramel's] use of force was not statutorily justified." Thereafter, the State of Kansas timely appealed.

5

On appeal, the State contends that the district court erred in finding that the State did not meet its burden of establishing probable cause that Rotramel's use of deadly force was not justified. It argues that Rotramel did not possess a reasonable belief that the use of deadly force was necessary to prevent imminent death or great bodily harm. In the alternative, the State argues that Rotramel was the aggressor and is not entitled to immunity from prosecution. In response, Rotramel contends that the district court appropriately found that she was immune from prosecution.

*Kansas "Stand-Your-Ground" Law*

In 2010, the Kansas Legislature enacted a series of statutes addressing the use of force—including the use of deadly force—in the defense of a person or property. See K.S.A. 21-5220 et seq. These statutes are commonly known as the "Stand-Your-Ground" law. See *State v. Barlow*, 303 Kan. 804, 804, 368 P.3d 331 (2016). The "Stand-Your-Ground" law not only allows the use of reasonable force but also provide immunity from prosecution or liability in certain situations.

The terms "use of force" and "use of deadly force" are defined in K.S.A. 2018 Supp. 21-5221:

> "(a) As used in . . . K.S.A. 2018 Supp. 21-5202 through 21-5208, 21-5210 through 21-5212, and 21-5220 through 21-5231, . . . and amendments thereto:
>
> (1) 'Use of force' means any or all of the following directed at or upon another person or thing:  (A) Words or actions that reasonably convey the threat of force, including threats to cause death or great bodily harm to a person; (B) the presentation or display of the means of force; or (C) the application of physical force, including by a weapon or through the actions of another.

(2) 'Use of deadly force' means the application of any physical force described in paragraph (1) which is likely to cause death or great bodily harm to a person. Any threat to cause death or great bodily harm, including, but not limited to, by the display or production of a weapon, shall not constitute use of deadly force, so long as the actor's purpose is limited to creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another or to affect a lawful arrest.

"(b) An actor who threatens deadly force as described in subsection (a)(1) shall be subject to the determination in subsection (a) of . . . K.S.A. 2018 Supp. 21-5222, and amendments thereto, and not to the determination in subsection (b) of . . . K.S.A. 2018 Supp. 21-5222, and amendments thereto."

Next, K.S.A. 2018 Supp. 21-5222 sets forth when the use of force is justified:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

Moreover, K.S.A. 2018 Supp. 21-5224(a) provides a presumption that the use of deadly force is reasonable under certain circumstances:

"(a) For the purposes of . . . K.S.A. 2018 Supp. 21-5222 and 21-5223, and amendments thereto, a person is presumed to have a reasonable belief that deadly force is

7

necessary to prevent imminent death or great bodily harm to such person or another person if:

    1.   The person against whom the force is used, at the time the force is used:

(A) Is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, the dwelling, place of work or occupied vehicle of the person using force; or

(B) has removed or is attempting to remove another person against such other person's will from the dwelling, place of work or occupied vehicle of the person using force; and

(2) the person using force knows or has reason to believe that any of the conditions set forth in paragraph (1) is occurring or has occurred.

"(b) The presumption set forth in subsection (a) does not apply if, at the time the force is used:

(1) The person against whom the force is used has a right to be in, or is a lawful resident of, the dwelling, place of work or occupied vehicle of the person using force, and is not subject to any order listed in K.S.A. 21-3843, prior to its repeal, or K.S.A. 2018 Supp. 21-5924, and amendments thereto, that would prohibit such person's presence in the property;

(2) the person sought to be removed is a child, grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the force is used;

(3) the person using force is engaged in the commission of a crime, attempting to escape from a location where a crime has been committed, or is using the dwelling, place of work or occupied vehicle to further the commission of a crime; or

(4) the person against whom the force is used is a law enforcement officer who has entered or is attempting to enter a dwelling, place of work or occupied vehicle in the lawful performance of such officer's lawful duties, and the person using force knows or

reasonably should know that the person who has entered or is attempting to enter is a law enforcement officer."

Regarding the duty to retreat, K.S.A. 2018 Supp. 21-5230 provides:

"A person who is not engaged in an unlawful activity and who is attacked in a place where such person has a right to be has no duty to retreat and has the right to stand such person's ground and use any force which such person would be justified in using under article 32 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or K.S.A. 2018 Supp. 21-5202 through 21-5208, 21-5210 through 21-5212, and 21-5220 through 21-5231, and amendments thereto."

Finally, K.S.A. 2018 Supp. 21-5231 provides immunity from criminal prosecution and civil liability under certain circumstances:

"(a) A person who uses force which, subject to the provisions of K.S.A. 2018 Supp. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 2018 Supp. 21-5222, 21-5223 or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

"(b) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (a), but the agency shall not arrest the person for using force unless it determines that there is probable cause for the arrest.

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause."

*Burden of Proof and Standard of Review*

In *State v. Ultreras*, 296 Kan. 828, 845, 295 P.3d 1020 (2013), the Kansas Supreme Court determined that the standard of proof for whether a defendant is entitled to immunity from criminal prosecution is probable cause. In addition, our Supreme Court held that the State bears the burden of establishing proof that the force used by the defendant was not justified as part of the probable cause determination under the immunity statute. 296 Kan. at 845. In other words, the State bears the burden of proving a negative—that the defendant's use of force in self-defense or defense of another person was not justified.

In *Hardy*, 305 Kan. 1001, the Kansas Supreme Court clarified the analysis to be made by a district court in determining whether a defendant is immune from prosecution:

> "Upon a motion for immunity pursuant to K.S.A. 2016 Supp. 21-5231, the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." 305 Kan. 1001, Syl. ¶ 1.

In reaching this conclusion, our Supreme Court made it clear that a district court is not to view the evidence in a light favoring the State. Instead, a district court should look at the totality of the circumstances. Thus, a district court must determine—based on a review of all of the evidence presented—whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified. 305 Kan. at 1011.

On appeal of a district court's decision on a motion for immunity, we are to apply the following standard of review:

10

"An appellate court will apply a bifurcated standard of review to a district court's determination of probable cause pursuant to K.S.A. 2016 Supp. 21-5231. When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo." 305 Kan. 1001, Syl. ¶ 5.

*Application of "Stand-Your-Ground" Law*

Here, based on our review of the record, we conclude that the district court's factual findings were supported by substantial competent evidence. Testimony at the evidentiary hearing support the following factual findings made by the district court:

- Rotramel and Hamm were in a relationship over the course of several months.
- Within a few weeks, Hamm began physically abusing Rotramel.
- The physical abuse included Hamm hitting, kicking, and pushing Rotramel.
- Hamm held a gun to Rotramel's head on several occasions;
- On the day of Hamm's death, Rotramel was attempting to leave him.
- Rotramel also planned to give the police a jacket that she believed constituted evidence of a crime committed by Hamm.
- Rotramel hoped that Hamm would be arrested and go to jail so that he would not continue to harass her.
- While loading her SUV with her belongings, Hamm hit Rotramel, grabbed her neck, threw her to the ground, and forcefully held her down.
- As Rotramel was leaving the house for the last time, she took her gun.
- Hamm chased Rotramel and got into her SUV.
- Rotramel told Hamm to get out of the SUV.

11

- When Hamm refused to get out of her SUV, Rotramel sped off while waiving the gun in the air "to draw attention to anybody that would look at me just so that maybe they would call the cops."
- While Rotramel was driving, Hamm continuously pushed and hit her.
- Hamm tried to reach over to open Rotramel's door and told her he was going to throw her out of the SUV.
- In the SUV, Hamm hit the back of Rotramel's neck and pulled her hair.
- Hamm grabbed ahold of the steering wheel and swerved the SUV as Rotramel drove.
- The driver of another vehicle noticed that the man in the SUV (Hamm) was leaning over onto the driver (Rotramel).
- Rotramel threw Hamm's jacket out of the SUV.
- Hamm told Rotramel, "I'm going to throw you out of the fuckin car if you throw my shit out of the car."
- Hamm told Rotramel to go back and get the jacket.
- Rotramel told police that she remembers grabbing the gun because Hamm was trying to throw her out of the SUV.
- The last thing Rotramel remembered before the shooting was that Hamm had ahold of her hair.
- At some point, Rotramel told Hamm that if he did not leave her alone she would use the gun.
- Although Rotramel does not specifically recall shooting Hamm, she indicated that she was fearful for her life.

A reasonable person could conclude based on this evidence that Hamm instigated the violence when he got into Rotramel's SUV and began threatening her. In particular, a reasonable person could conclude that Rotramel was in imminent risk of great bodily harm as Hamm hit her, pulled her hair, grabbed the steering wheel, and threatened to

12

throw her out of the SUV. Additionally, although Rotramel may not recall the specific moment in which she shot Hamm, a reasonable person could conclude from this evidence that she knowingly brandished a handgun—that she knew to be a deadly weapon—during the heat of the attack in an attempt to defend herself.

Moreover, we find as a matter of law that Rotramel was entitled to the statutory presumption found in K.S.A. 2018 Supp. 21-5224. The plain language of the statute provides that "a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm to [a] person . . . if . . . [t]he person against whom the force is used, at the time the force is used . . . has unlawfully or forcefully entered, and is present within, the . . . occupied vehicle of the person using force." K.S.A. 21-5224(a)(1)(A). This presumption also exists when the person "is attempting to remove another person against such other person's will from the . . . occupied vehicle of the person using force[.]" K.S.A. 21-5224(a)(1)(B).

In this case, it is undisputed that Hamm was unlawfully inside of Rotramel's SUV at the time she shot him. A reasonable person could also conclude based on the evidence that Rotramel fired the deadly shot while she was under attack in her own SUV. There is evidence in the record to support a finding that Rotramel told Hamm to get out of the vehicle and he refused. As indicated above, there is also evidence in the record to support a finding that Hamm threatened to throw Rotramel from her SUV, that he struck her in the back of the head, that he pulled her hair, that he grabbed the steering wheel, and that he attempted to throw her out of the SUV. Accordingly, we find that the district court correctly concluded that Rotramel was "presumed to have had a reasonable belief that deadly force was necessary to prevent imminent death or great bodily harm" pursuant to K.S.A. 2018 Supp. 21-5224(a).

13

The State's next claim argues that the district court erred when it found that Rotramel acted knowingly. In its memorandum decision, the district court found

"that [Rotramel], in the heat of an argument, brandished a handgun—that she knew to be a deadly weapon—which she was vaguely familiar with . . . after being struck several times in the back of her head and having her hair pulled, and having her own life threatened. In the excitement of that moment, [Rotramel] fired the fatal shot that killed . . . Hamm.

". . . In this context, [Rotramel] knew she possessed a firearm and was aware of the circumstances in which she was acting. And, so, for the purpose of classifying her culpable mental state, she acted knowingly."

A person acts knowingly when

"with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result." K.S.A. 2018 Supp. 21-5202(i).

Here, we find substantial competent evidence existed for the district court to conclude that Rotramel acted knowingly. It is reasonable to infer based on the evidence that Rotramel knew that the gun was a deadly weapon, and she testified that she knew the gun lacked a safety. She also testified that she test fired the gun prior to purchasing it and that the salesperson told her to keep her finger off the trigger to avoid discharging the weapon. Furthermore, Rotramel testified that she warned Hamm that she would fire the weapon if he did not stop hitting her and trying to force her from the vehicle.

Although the State represented to this court at oral argument that there was no testimony in the record that Rotramel ever pointed the gun at Hamm, this is not accurate. In reviewing the transcript of the hearing held on February 27, 2018, we see that the State

14

called Ivan Quintinar as a witness. Quintinar testified that he had been driving near the scene of the shooting and pulled over to assist Rotramel. In addition, he is the one who called the police after Rotramel told him that she had shot Hamm. Quintinar testified that Rotramel told him that Hamm "wouldn't leave me the F alone. *I had a gun pointed at him and I shot him.*" (Emphasis added.)

A reasonable person could infer from the evidence that Rotramel was "aware that [her] conduct [was] reasonably certain to cause the result." K.S.A. 2018 Supp. 21-5202(i). Put more simply, one can infer from the evidence that Rotramel knew that waiving or pointing a loaded firearm, without a safety on it, in the SUV while she was driving was reasonably certain to cause death or serious injury to Hamm. In fact, the State felt that there was sufficient evidence against Rotramel to charge her with intentionally killing Hamm. Thus, we cannot say it was unreasonable for the district court to conclude that she knowingly used deadly force against Hamm based on the evidence presented at the immunity hearing.

Acknowledging Rotramel's testimony indicating that Hamm threatened to push her from the vehicle, the State argues that "there is no indication that [Rotramel] was ever truly in imminent danger of being pushed out of the SUV[.]" The State also adds that Rotramel could have just stopped driving the vehicle and any apprehension about being pushed from a moving SUV would have ceased. Although this may be another reasonable interpretation of the evidence, we cannot replace our judgment for that of the district court.

Based on our review of the record, we find substantial evidence to support the district court's finding that "throwing a person out of a moving car certainly is something that would be able to cause death or imminent bodily harm." In addition, a reasonable person could conclude that Hamm grabbing the steering wheel of a moving vehicle could also cause death or great bodily harm. It is also reasonable to infer from the evidence that

15

the attack by Hamm continued both while the vehicle was moving and while it was stationary.

Finally, the State argues in the alternative that Rotramel was the aggressor in the confrontation and is precluded as a matter of law from receiving statutory immunity. In Kansas, a person who acts as an aggressor is not entitled to immunity from prosecution under K.S.A. 2018 Supp. 21-5231(a).

> "The justification described in . . . K.S.A. 2018 Supp. 21-5222, 21-5223 and 21-5225, and amendments thereto, is not available to a person who:
>
> . . . .
>
> (b) *initially provokes the use of any force against such person or another*, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or
>
> (c) otherwise initially provokes the use of any force against such person or another, unless:
>
> (1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or
>
> (2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."
> (Emphasis added) K.S.A. 2018 Supp. 21-5226.

A review of the record in this case reveals substantial evidence upon which a reasonable person could conclude that Rotramel was not the initial aggressor. Rotramel testified that while she was loading the SUV, Hamm would "continuously hit me in the back and grab my neck, and then he like, threw me down . . . he'd throw me to the ground continuously. He would forcefully hold me down, like, to where I was not able to leave." She also testified that she did not want Hamm in her SUV and "was yelling for him to get

out." Regarding the testimony that Rotramel may have pointed a knife at Hamm prior to her leaving the house in her SUV, the district court found:

> "There is some indication about a knife being brandished towards . . . Hamm during the time that [Rotramel] was attempting to load the car. When asked, . . . Rotramel did not recall that, even though she was given the opportunity to review the [police interview] transcript. Then Detective Cory was called as a rebuttal witness, and he recounted his interview where . . . Rotramel stated that she was holding a knife towards [Hamm] telling [Hamm] to stay away, that he grabbed for it, and that was the explanation for how [Hamm] was injured that day.
>
> . . . .
>
> "In considering the totality of the circumstances without deference to the State with regard to this knife wielding episode or that part of the incident—and, of course, not all the evidence that has been drawn out, that, I would imagine, with full evidence being submitted, you could possibly conclude that even at that point, . . . Rotramel was defending herself against . . . Hamm from his attacks. . . .
>
> "Well, there's no real tie in the sequence of events when that knife-wielding episode occurred in relation to some of these other events that . . . Rotramel testified about. So a couple aspects in regard to the conclusion that can be reached in that part of the episode is that one, [Rotramel] may be have been defending herself even then; and, secondly, if not, it is clear from [Rotramel's] testimony that when [Rotramel] got into the car, [Rotramel] attempted to leave without [Hamm]."

We find the district court's conclusion to be reasonable based on a totality of the evidence presented at the immunity hearing.

In summary, our task on appeal is not to replace our judgment for that of the district court on factual questions. Instead, our task is to determine whether there was substantial competent evidence supporting the district court's factual findings and

17

whether those findings support the district court's legal conclusion that Rotramel is entitled to immunity. In doing so, it is important to keep in mind that the burden was on the State to establish that her use of force was not legally justified under the circumstances of this case. See *State v. Ultreras*, 296 Kan. at 845.

After weighing the evidence, the district court found in this case that "the State has not carried its burden to establish probable cause that [Rotramel's] use of force was not statutorily justified." Although our conclusion may or may not have been the same had we been the triers of fact, we find the district court's decision was supported by substantial competent evidence in the record. Therefore, given our standard of review, we conclude the district court did not err in granting Rotramel immunity from prosecution and dismissing this action.

Affirmed.