NOT DESIGNATED FOR PUBLICATION

No. 122,004

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAMION K. LOONEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed January 15, 2021. Affirmed in part and dismissed in part.

*Mark Sevart*, of Derby, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MALONE, J., and MCANANY, S.J.

PER CURIAM: Following remand for resentencing from this court's decision in *State v. Looney*, No. 117,398, 2018 WL 3485727, at *1 (Kan. App. 2018) (unpublished opinion) (*Looney I*), the trial court denied Looney's renewed request for a downward durational departure and refused to consider Looney's new trial motion under a belief that its consideration violated the *Looney I* mandate. Looney now appeals those decisions.

As to the denial of his downward durational departure motion, Looney argues that certain mitigating factors established that the trial court should have granted his

1

downward durational departure motion at resentencing. Yet, for each of his convictions, the trial court imposed presumptive sentences under the Kansas Sentencing Guidelines Act (KSGA). Because this court lacks jurisdiction to consider the denial of a departure motion when the trial court imposes KSGA presumptive sentences, this issue is not properly before this court. *State v. Huerta*, 291 Kan. 831, 836, 247 P.3d 1043 (2011). Thus, we dismiss this argument for a lack of jurisdiction.

As to the trial court refusing to consider his new trial motion upon remand, Looney's new trial motion hinged on our Supreme Court's holding in *State v. Hardy*, 305 Kan. 1001, 390 P.3d 30 (2017), that trial courts should not view the evidence in the light most favorable to the State when reviewing a defendant's immunity motion. Our Supreme Court issued this holding while Looney's case was pending before this court in *Looney I*. And it is undisputed that in denying Looney's pretrial immunity motion, the trial court viewed the evidence in the light most favorable to the State. Thus, in moving for a new trial upon remand, Looney asked the trial court to reconsider the denial of his immunity motion under this intervening change of law. As he did below, Looney asserts that the *Looney I* mandate did not prevent him from making a new trial motion upon remand.

Nevertheless, for reasons stated below, Looney's argument about the trial court's refusal to consider his new trial motion upon remand is unpersuasive. So we affirm because the trial court did not err by refusing to consider Looney's new trial motion or, if it was error, the error was harmless. Thus, we affirm in part and dismiss in part.

*Looney's Jury Trial*

On July 28, 2015, the State charged Looney with the following: (1) the aggravated battery of Breanna Connell; (2) the aggravated battery of Quinten Edwards; (3) the aggravated battery of Davis McCoy; (4) the aggravated assault of Sean O'Neil; (5)

the aggravated assault of Christian Wells; (6) animal cruelty; and (7) criminal possession of a firearm. Later, the State also charged Looney with criminal discharge of a firearm.

The State's charges against Looney stemmed from his violent altercation with his then-fianceé Connell and her friends—Edwards, McCoy, O'Neil, and Wells—late in the evening of July 23, 2015, and early in the morning of July 24, 2015. It is undisputed that during the evening of July 23, 2015, while at a bar with Connell and her friends, Looney sprayed mace in Connell's face, which resulted in his removal from the bar. Afterwards, Looney returned to his and Connell's shared home while Connell remained at the bar with her friends. Upon arriving home, Looney threw his and Connell's cat Nola against a wall so hard that he broke Nola's back, resulting in Nola's death. Looney ultimately pleaded guilty to animal cruelty for killing Nola; thus, this fact is undisputed.

Notwithstanding the preceding, sometime after killing Nola, in the early morning hours of July 24, 2015, Connell's friends dropped her off at her and Looney's shared home. At the jury trial on Looney's remaining charges, Connell and her friends testified that Looney started a fight by threatening Connell with his gun. Looney, on the other hand, testified that he never threatened Connell with his gun. Instead, Looney alleged that he had his gun with him because he had been contemplating suicide following his clash with Connell at the bar. Also, he alleged that he acted in self-defense and in defense-of-others, that is, defense-of-Connell, during the dispute that ensued between him and Connell's friends.

In Looney's initial appeal to this court, this court summarized Connell's and Looney's different versions of events as follows:

3

"*Connell's version of events*

"When Connell got back to the house, she went inside and grabbed a container of cottage cheese from the refrigerator. As she walked into the living room, she heard a gunshot. As Connell went to ask Looney why he was using guns and mace, Looney backed her onto the couch, holding the gun between her eyes. Connell slammed the container of cottage cheese into Looney's face, grabbed her phone, and ran outside to call her friends to come back and pick her up. Looney followed her outside and tackled her to the ground. While they were outside, Connell's friends showed up. Edwards and McCoy approached Connell and Looney, walking calmly with their hands in the air. Connell was screaming and warned them that Looney was dangerous and had a gun. Eventually, they helped Connell get into their car.

"Connell and Edwards decided to return to the house to retrieve Connell's dog. When they were walking up to the house, Edwards saw Looney walking around to the front of the house, still brandishing his gun. Once they were inside, Edwards locked the door so that Looney could not come in and took Connell to the basement for her safety. Looney was yelling and unsuccessfully tried to kick in the door. Looney turned to McCoy, who was also outside the front door, pointed the gun at him, and told him that he would shoot him if he did not get the door open. When McCoy was unsuccessful at opening the front door, Looney hit him in the forehead with the nose of the gun.

"After realizing that neither the front nor the side door would open, Looney noticed Wells and O'Neil waiting in the vehicle parked on the street. Looney approached the vehicle and pointed the gun at Wells. O'Neil was on the phone with law enforcement. Looney told them that if anyone called the police, he would shoot everyone. He turned to O'Neil and told him that he better not be contacting the police, still threatening to shoot. Looney then ran back toward the house. A bleeding McCoy ran to the vehicle, told them to leave the area, and then ran back toward the house. O'Neil and Wells heard a gunshot as they were pulling away. O'Neil remained on the phone with 911 dispatch, narrating what he saw and heard.

"Looney made it to the side of the house right when Edwards was at the top of the stairs. Looney yelled for Connell to get out of the house and then fired shots into the house. A shot hit Edwards in the back of the head, and he fell backwards down the stairs. Connell heard someone at the door, ran upstairs, and saw McCoy, who called the police. Edwards survived but has significant long-term effects of his injuries.

4

"According to Looney, about an hour after he almost attempted suicide, he saw a car pull up outside his house, and Connell got out. When Connell entered the house, she and Looney began arguing. Looney told Connell how upset he had been and that he had shot the couch instead of himself, but Connell did not believe him. Looney pointed out that Connell had come home without her engagement ring on. Connell asked for her phone and went outside, and Looney went into the bathroom and cried.

"When Connell came back in the house, the door opened behind her and Edwards ran into the house and grabbed her, picking her up and carrying her out the front door. Looney grabbed his gun and ran after them. Looney saw Edwards trying to put Connell in his car, heard Edwards yell for her to get in the car, and heard Connell yell that she was not going. Looney testified that he was terrified. He screamed and ran toward Connell as she broke loose of Edwards. Connell then ran into the house, with Edwards and McCoy running behind her. Looney pulled out his gun, pointed it at Edwards and McCoy, and told them to leave.

"Connell was also yelling at the men to leave, but Edwards came through the front door and entered the house. Looney pointed the gun at Edwards and told him to get out, but McCoy grabbed Looney from behind, pinning Looney's arms to his side. Looney fired two shots into the floor to scare McCoy, hoping McCoy would let him go. Instead, Edwards and McCoy dragged Looney out of the house and locked the front door. Looney could hear Connell screaming from inside and could see that she was on the floor. He tried to kick in the door.

"McCoy ended up outside the house with Looney. The two got into a fight, and Looney put the gun to McCoy's head and threatened to shoot him. Instead of shooting him, Looney hit McCoy on the head with the gun. After the scuffle, Looney ran to the side of the house, looked through the door, and saw Connell being dragged down the stairs. When he saw someone coming up the stairs, Looney shot through the side door. Not aiming at anyone or anything in particular, he shot as an instinctive reaction to having seen Connell being dragged down the stairs without making a sound. After shooting, Looney saw Edwards with a bloody face, bleeding from the head.

"Looney ran away, put the gun in a tree, spent the night in an alley, and was found the next day by police." *Looney I*, 2018 WL 3485727, at *1-2.

Because Looney alleged that he acted in self-defense, at his jury instruction conference, Looney requested that the trial court instruct the jury on self-defense. He also asked the trial court to instruct the jury on defense-of-others as to the aggravated battery of Edwards. The trial court granted Looney's request in part. It instructed the jury on self-defense as to the aggravated battery of McCoy and defense-of-Connell as to the aggravated battery of Edwards. Yet, the trial court refused to instruct the jury on self-defense as to Looney's other charges because it determined that a self-defense instruction was factually inappropriate.

In the end, the jury convicted Looney of the aggravated assault of O'Neil, the aggravated assault of Wells, criminal discharge of a firearm, and criminal possession of a firearm. The jury also convicted Looney of the reckless aggravated battery of Edwards; this was a lesser included offense of Looney's knowing aggravated battery of Edwards charge. But the jury acquitted Looney of the aggravated batteries of Connell and McCoy. The trial court then sentenced Looney to a controlling term of 239 months' imprisonment followed by 12 months' jail-time, followed by 36 months' postrelease supervision.

*Looney's Initial Appeal*

After his sentencing, Looney appealed his convictions and sentence to this court. Looney argued that this court should reverse his convictions and vacate his sentence for the following reasons: (1) because the trial court wrongly treated his deferred adjudication from Texas as a felony conviction in Kansas for the purpose of satisfying the "felon" element of his felon in possession of a firearm conviction; (2) because the trial court wrongly treated his deferred adjudication from Texas as a felony conviction in Kansas for purposes of calculating his criminal history score; (3) because the State

6

presented insufficient evidence to support his aggravated assault of Wells conviction; (4) because the trial court erred by not instructing the jury on self-defense as to his aggravated assault convictions; and (5) because the trial court erred by not instructing the jury on defense-of-others as to his criminal discharge of a firearm conviction. *Looney I*, 2018 WL 3485727, at *3-7.

Ultimately, this court agreed with Looney's first, second, and third arguments. Relying on our Supreme Court precedent in *State v. Hankins*, 304 Kan. 226, 372 P.3d 1124 (2016), because no judgment of guilt had ever been entered against Looney in his Texas deferred adjudication case, this court held that the trial court could not consider Looney's Texas deferred adjudication as a conviction in Kansas for any purpose. *Looney I*, 2018 WL 3485727, at *3. In turn, this court did two things: First, it reversed Looney's felon in possession of a firearm conviction because Looney's Texas deferred adjudication could not satisfy the "felon" element of that offense. Second, it remanded to the trial court for resentencing without consideration of Looney's Texas deferred adjudication for criminal history purposes. 2018 WL 3485727, at *4.

Also, this court reversed Looney's aggravated assault of Wells conviction. This court agreed that the State presented insufficient evidence to support this conviction because nothing indicated that Looney's threat placed Wells in "reasonable apprehension of immediate bodily harm," which is an element of aggravated assault. 2018 WL 3485727, at *4.

Nevertheless, this court rejected Looney's remaining arguments. This court held that the trial court properly denied Looney's request to instruct the jury on self-defense as to his aggravated assault charges because, in his case, the self-defense instruction was factually inappropriate. *Looney I*, 2018 WL 3485727, at *6. Then this court held that Looney could not establish that the trial court clearly erred by failing to instruct the jury on defense-of-others as to his criminal discharge of a firearm conviction because the jury

7

had rejected Looney's defense-of-others claim as to his aggravated battery of Edwards charge; both Looney's aggravated battery of Edwards charge and his criminal discharge of a firearm charge arose from the same act. 2018 WL 3485727, at *7.

Next, after this court issued *Looney I*, Looney petitioned our Supreme Court for review. Yet, our Supreme Court ultimately denied Looney's petition for review. Then, on May 6, 2019, this court issued its mandate to the trial court. The mandate provided that the judgment of the trial court was "affirmed in part, reversed in part, sentence vacated, and remanded with directions upon the denial." Of note, the last paragraph of *Looney I* included the following orders: "We reverse Looney's convictions for criminal possession of a firearm and for aggravated assault of Wells. We remand for resentencing without consideration of Looney's Texas deferred adjudication for aggravated assault with a deadly weapon. We affirm in all other respects." 2018 WL 3485727, at *7.

*Looney's New Trial Motion Upon Remand*

Upon remand, the trial court held Looney's resentencing hearing. But at the outset of his resentencing hearing, Looney moved for a new trial.

Looney's new trial motion hinged on the trial court's previous denial of his self-defense immunity from prosecution motion. In June 2016, several months before his jury trial, Looney had moved for immunity from prosecution under a theory of self-defense. In August 2016, the trial court held an evidentiary hearing on Looney's self-defense immunity motion. But at the conclusion of that hearing, the trial court denied the motion from the bench.

The trial judge who denied Looney's immunity motion explained that it was doing so based on this court's holding in *State v. Hardy*, 51 Kan. App. 2d 296, 347 P.3d 222 (2015), *rev'd* 305 Kan. 1001, 390 P.3d 30 (2017). There, this court held that when

8

considering a defendant's immunity motion, "[t]he district court must view the evidence in a light favoring the State, meaning conflicts in the evidence must be resolved to the State's benefit and against a finding of immunity." 51 Kan. App. 2d 296, Syl. Thus, in denying Looney's immunity motion based on this court's *Hardy* decision, the trial judge "resolve[d] all [evidentiary] conflicts in a light favoring the State."

Yet, in March 2017, after Looney had filed his notice of appeal in *Looney I* but before he submitted his appellant's brief, our Supreme Court reversed this court's *Hardy* decision, holding as follows:

> "[U]pon a motion for immunity pursuant to K.S.A. 2016 Supp. 21-5231, the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." 305 Kan. at 1011.

In his initial appeal, Looney did not challenge the trial court's denial of his self-defense immunity motion. Nevertheless, at his resentencing hearing upon remand, Looney asserted that the trial court should grant his new trial motion because when it denied his self-defense immunity motion, it considered the evidence in the light most favorable to the State contrary to our Supreme Court's decision in *Hardy*. In other words, Looney argued that he was entitled to the application of our Supreme Court's holding in *Hardy* because it had occurred while his case was pending on direct appeal.

Yet, the State countered that Looney's new trial motion was "not properly before the Court" because it was "not the subject of the remand." In the end, the trial court agreed with the State. It explained that it would not consider Looney's new trial motion because it could not do so under this court's appellate mandate: "The remand [was] very specific. It was to correct a criminal history issue as well as the Court of Appeals finding that there was insufficient evidence on one of the counts."

9

Afterwards, the trial court denied Looney's downward durational departure motion and sentenced Looney to a controlling term of 111 months' imprisonment followed by 12 months' jail-time, followed by 36 months' postrelease supervision.

Looney timely appeals.

*Did the Trial Court Err by Not Considering Looney's Motion for a New Trial on Remand?*

Although Looney's appellate brief is sometimes vague, it is readily apparent that he continues to make the same argument that he made before the trial court upon remand: Our Supreme Court's *Hardy* holding applies to him because our Supreme Court issued its *Hardy* decision while his direct appeal before this court was still pending. Thus, upon remand from the *Looney I* court, the trial court here had to consider this change of law as raised in his new trial motion.

Significantly, under our Supreme Court precedent, "'a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final.' [Citation omitted.]" *Gaudina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004); see also *State v. Broxton*, 311 Kan. 357, Syl. ¶ 3, 461 P.3d 54 (2020) (holding that "[a] defendant may claim the benefit of developments in the law occurring while his or her case is pending on direct appeal."). Thus, our Supreme Court precedent suggests that Looney is entitled to reconsideration of his self-defense immunity motion based on the change of law described by our Supreme Court in *Hardy*.

In its brief, however, the State contends that the trial court had the authority only to resentence Looney upon remand because this court's mandate from *Looney I* was "precisely limited to the matter of resentencing." Also, the State argues that upon remand,

10

Looney could not relitigate the trial court's denial of his self-defense immunity motion because Looney abandoned his ability to do so by not challenging the denial of his self-defense immunity motion in *Looney I*. For this reason, the State argues that the immunity issue has been finally decided against Looney.

The State's arguments, however, do not directly address Looney's underlying assertion that our Supreme Court's decision in *Hardy* constituted a change of law that he was entitled to claim the benefit of upon remand. Instead, the State's arguments hinge on its belief that the *Looney I* court's mandate barred the trial court from reconsidering the earlier denial of Looney's self-defense immunity motion upon remand.

In arguing that the mandate rule precluded the trial court's review of Looney's new trial motion, the State relies on K.S.A. 60-2106(c), K.S.A. 20-108, *State v. Collier*, 263 Kan. 629, 952 P.2d 1326 (1998), and *State v. Soto*, 310 Kan. 242, 445 P.3d 1161 (2019). The State recognizes that in *Soto*, our Supreme Court held that the mandate rule does not preclude a defendant from raising new or outstanding issues upon remand. Even so, the State asserts that Looney's case is distinguishable from *Soto* because Looney is not raising a new or outstanding issue on remand. Instead, according to the State, Looney's new trial motion upon remand simply sought to relitigate the trial court's original denial of his self-defense immunity motion, which he abandoned by not challenging it in *Looney I*.

*Appellate Mandate Law*

To fully address the parties' arguments, this court must first review the relevant law on appellate mandates.

K.S.A. 60-2106(c) describes the appellate court process of issuing mandates and discusses the effect of an appellate mandate on the trial court. It provides:

11

"The supreme court may by rule provide for post decision motions for rehearing or other relief. When under such rule a decision of an appellate court becomes final, such court shall promptly cause to be transmitted to the clerk of the district court its mandate containing such directions as are appropriate under the decision. A copy of the opinion of the court shall accompany and be a part of the mandate. The clerk of the district court shall make a notation thereof on the appearance docket. Such mandate and opinion, without further order of the judge, shall thereupon be a part of the judgment of the court if it is determinative of the action, or shall be controlling in the conduct of any further proceedings necessary in the district court."

Meanwhile, K.S.A. 20-108 states that Kansas appellate courts have the authority to issue mandates to Kansas trial courts:

"An appellate court of this state may require the district court of the county where any action or proceeding shall have originated to carry the judgment or decree of the appellate court into execution; and the same shall be carried into execution by proper proceedings, by such district court, according to the command of the appellate court made therein."

In *Collier*, our Supreme Court considered the preceding statutes while determining whether the trial court violated its mandate upon its initial remand for resentencing. Following his initial appeal, our Supreme Court vacated Collier's hard 40 sentence and remanded for resentencing because the State had not timely filed its notice requesting the imposition of Collier's hard 40 sentence. Upon remand, however, the trial court allowed the State to present evidence that it had properly filed its notice requesting the imposition of Collier's hard 40 sentence. Because it agreed that the State's notice was properly filed, the trial court ultimately reimposed Collier's hard 40 sentence.

Collier appealed from his resentencing, and our Supreme Court reversed the trial court because it had violated the law of the case doctrine and the mandate rule by

12

reconsidering the adequacy of the State's notice to impose a hard 40 sentence upon remand. *Collier*, 263 Kan. at 637. Concerning the law of the case doctrine, our Supreme Court explained that the doctrine "applied to avoid indefinite relitigation of the same issue, to obtain consistent results in the same litigation, to afford one opportunity for argument and decision of the matter at issue, and to assure the obedience of lower courts to the decisions of appellate courts." *Collier*, 263 Kan. 629, Syl. ¶ 2. As for the mandate rule, our Supreme Court determined that the plain language of K.S.A. 60-2106(c) and K.S.A. 20-108 existed to ensure that an appellate court's mandate from a previous appeal becomes a controlling judgment in any further proceedings. *Collier*, 263 Kan. at 635-36. Our Supreme Court then concluded that it was "axiomatic" that upon remand from an appellate mandate that the trial court "proceed in accordance with the mandate and the law of the case as established on appeal." *Collier*, 263 Kan. 629, Syl. ¶ 4.

Thus, in *Collier*, our Supreme Court held that trial courts must follow appellate mandates upon remand. And in doing so, "the trial court must implement both the letter and spirit of the mandate." 263 Kan. 629, Syl. ¶ 4.

Yet, in *Soto*, our Supreme Court clarified that the mandate rule did not bar the trial court from considering new or undecided issues upon remand. In Soto's initial appeal, our Supreme Court determined that Soto's hard 50 sentence violated the United States Supreme Court's decision in *Alleyne v. United States*, 570 U.S. 99, 111-16, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). Thus, our Supreme Court vacated Soto's hard 50 sentence and remanded for resentencing. Upon remand, Soto moved for a new trial based on newly discovered evidence indicating that the State had violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). But the trial court refused to consider Soto's new trial motion because it determined that consideration of the motion fell outside the scope of the Supreme Court's mandate. *Soto*, 310 Kan. at 248.

13

Soto appealed this ruling to our Supreme Court, arguing that its mandate did not bar the trial court from considering his new trial motion upon remand. The State countered that the trial court properly ignored Soto's new trial motion because the mandate merely discussed resentencing Soto, which meant the trial court had "no jurisdiction to do anything else after remand, period." *Soto*, 310 Kan. at 250. Also, the State cited to K.S.A. 60-2106(c), K.S.A. 20-108, and *Collier* to support its argument. 310 Kan. at 250, 253.

In disagreeing with the State's arguments, our Supreme Court first explained that the State's reliance on K.S.A. 60-2106(c) and K.S.A. 20-108 was misplaced:

> "The language of neither K.S.A. 60-2106(c) nor K.S.A. 20-108 explicitly or even implicitly deprives a district court of its jurisdiction to address an entirely new issue that surfaces in a case as a result of events that occur after a mandate issues. And it is not this court's task to add to the plain language of a longstanding legislative formulation to effectuate a party's desire.
>
> "In addition, the historical record of the enactments tends to show that these statutes were merely designed to enforce the hierarchy of Kansas courts, ensuring that appellate orders would not be ignored by lower courts. They were not designed to set up broad limits on subject matter jurisdiction once a case was remanded. [Citation omitted.]" *Soto*, 310 Kan. at 252.

Our Supreme Court then explained that despite the State's arguments to the contrary, the *Collier* court never held that trial courts may consider only issues addressed in the appellate mandate upon remand:

> "We have no quarrel today with *Collier*'s recitation of the origins of the mandate rule or its application of the rule and the doctrine of law of the case generally to prevent the State and the district court from revisiting an issue already settled by the appellate court. It is exactly such relitigation that the mandate rule should eliminate. But *Collier* simply cannot do the heavy lift the State assigns to it. It did not call the mandate rule

14

jurisdictional, and it did not eliminate the district court's ability to address any matter left undecided by the issuance of the appellate mandate." *Soto*, 310 Kan. at 253-54.

Then, based on this analysis, as well as other Kansas precedent, our Supreme Court defined the mandate rule as follows:

"The [mandate] rule applies to prevent district court action on remand only when an issue has already been finally settled by earlier proceedings in a case, including issuance of the appellate mandate. If a final settlement of an issue has occurred, the district judge is not free to expand upon or revise that history. The mandate rule does not, however, prevent a district judge from doing whatever else is necessary to dispose of a case. This means the district judge must not only do as the mandate directs; he or she must also do what is needed to settle other outstanding issues that must be decided to complete district court work on the case. Such issues may have been allocated for decision in the district court in the first place and then untouched by appellate proceedings. They may [also] include issues arising from late-breaking facts. [Citations omitted.]" 310 Kan. at 256.

Finally, our Supreme Court held that under the preceding mandate rule, the trial court erred by not considering Soto's new trial motion upon remand because "Soto [had] not [sought] to relitigate anything that predated the mandate." *Soto*, 310 Kan. at 256. He instead "sought the court's action on a legal issue arising from facts unknown to him until the morning his resentencing trial was set to begin." 310 Kan. at 256. Thus, our Supreme Court then reversed and remanded to the trial court for a hearing on Soto's newly discovered evidence-*Brady* violation claim. 310 Kan. at 262.

This case, however, is distinguishable from *Soto*. Unlike *Soto*, there was no newly discovered evidence in this case. For example, Looney's initial motion for a new trial was based, in part, on trial counsel's belief that the jury should have been allowed to fully consider Looney's theory of self-defense. The trial court here denied the motion for new trial and that issue was not raised by appellate counsel as part of Looney's direct appeal.

15

Thus, this issue would have been deemed abandoned because of Looney's failure to raise it in his direct appeal.

Under the *Soto* mandate rule, an appellate mandate controls all issues decided by the earlier proceedings in the case. So the appellate mandate would bar relitigating any issue that had been decided before the mandate. The appellate mandate here would have prevented Looney from relitigating the applicability of his self-defense theory at his resentencing hearing. Thus, the trial court here correctly ruled Looney's motion for a new trial was beyond the scope of the appellate mandate.

Indeed, this court's appellate mandate was clear, and it was precisely limited to the matter of resentencing Looney in accordance with the appropriate criminal history score. Thus, the trial court properly declined to engage in an analysis of Looney's motion about a new trial.

*Harmless Error*

Finally, Looney's underlying argument in his new trial motion about the *Hardy* change of law requiring reversal of his conviction is unpersuasive.

In *State v. Ultreras*, 296 Kan. 828, Syl. ¶ 3, 295 P.3d 1020 (2013), our Supreme Court held that if a trial court uses the wrong standard of proof at an immunity hearing, that error may be harmless if there is no reasonable probability that the error affected the outcome of the trial. Also, in *State v. Younger*, No. 116,441, 2018 WL 911414, at *3 (Kan. App. 2018) (unpublished opinion), this court applied the harmless error test from *Ultreras* in affirming Younger's convictions despite the trial court's consideration of the evidence in the light most favorable to the State contrary to our Supreme Court's *Hardy* decision when denying Younger's immunity motion.

16

To review, in this case, the jury acquitted Looney of the aggravated batteries of Connell and McCoy. The jury convicted Looney of the reckless aggravated battery of Edwards, the aggravated assault of O'Neil, the aggravated assault of Wells, criminal discharge of a firearm, and criminal possession of a firearm. But in *Looney I*, this court reversed Looney's aggravated assault of Wells and criminal possession of a firearm convictions for insufficient evidence. 2018 WL 3485727, at *3-4. Thus, only Looney's convictions for the reckless aggravated battery of Edwards, the aggravated assault of O'Neil, and the criminal discharge of a firearm remain in place.

Yet, the jury convicted Looney of the reckless aggravated battery of Edwards, a lesser included offense of his knowing aggravated battery of Edwards charge, despite being given an instruction that they could acquit him of this charge if they believed that he acted in defense of Connell. And in *Looney I*, this court relied on this fact to hold that the trial court did not clearly err by failing to instruct the jury on defense of others as to Looney's criminal discharge of a firearm conviction:

> "Although the jury was not instructed on the defense of others as to the criminal discharge of a firearm charge, it was instructed on the defense of others as to the aggravated battery charge involving Edwards, which occurred when Looney shot Edwards, upon discharging his firearm. The jury was not persuaded by that defense. Instead, the jury found Looney guilty of reckless aggravated battery even though it was specifically instructed to consider Looney's defense of others claim as to that charge. *We thus have no reason to believe that the jury would have acquitted Looney of reckless discharge of a firearm based on Looney's defense of others claim, had it been permitted to do so. Such a result would have been inconsistent with the jury's rejection of that defense on the charge of aggravated battery of Edwards.*" (Emphasis added.) 2018 WL 3485727, at *7.

Also, the *Looney I* court held that the trial court properly denied Looney's request for a self-defense instruction as to his aggravated assault of O'Neil conviction because

17

such an instruction was factually inappropriate. In particular, this court explained that Looney had failed to establish that a reasonable person in his circumstances would have threatened O'Neil with a gun. 2018 WL 3485727, at *6.

As a result, as to the crimes Looney still remains convicted of, the jury either rejected his defense-of-others argument or this court held that the trial court's failure to instruct the jury on self-defense and defense-of-others was not error. In turn, the jury's verdicts and this court's previous holdings in *Looney I* establish that any error stemming from the trial court's viewing of the evidence in the light most favorable to the State when denying Looney's immunity motion was harmless.

Simply put, it is unclear whether Looney ever intended to argue self-defense as to his aggravated battery of Edwards and criminal discharge of a firearm charges since Looney specifically requested a defense-of-others instruction on his aggravated battery of Edwards charge. Regardless, because the jury rejected his defense-of-others argument as to his aggravated battery charge and this court held that the failure to give a defense-of-others instruction as to his criminal discharge of a firearm charge was not clear error, nothing indicates that Looney was entitled to self-defense immunity as to those charges. Also, nothing indicates that the jury would have accepted Looney's self-defense argument as to those charges had Looney been allowed to make such an argument. A finding that Looney acted in self-defense would be inconsistent with the jury's finding that Looney was not acting in defense of Connell.

More importantly, at his trial, Looney testified that he was alone outside of his house when he fired his gun through his closed front door and shot Edwards. Looney explained that he never intended to shoot Edwards but was instead responding instinctively to Connell's screaming from inside the house. Yet, regardless of Looney's intentions, the fact Looney was alone outside his front door when he fired the shot that was the basis for both his aggravated battery of Edwards and criminal discharge of a

18

firearm charges establishes that there is no reasonable possibility (1) that he was entitled to self-defense immunity as to those charges or (2) that the jury would have acquitted him of those charges if given a self-defense instruction.

Lastly, it is readily apparent that the trial court's use of the wrong standard of proof at Looney's self-defense immunity hearing as to his aggravated assault of O'Neil charge is harmless. Because the *Looney I* court already determined that the trial court's failure to instruct the jury on self-defense as to Looney's aggravated assault of O'Neil charge was harmless, it necessarily follows that the trial court's denial of Looney's self-defense immunity motion while using the wrong standard of proof was harmless.

Also, as the *Looney I* court noted when rejecting Looney's argument that he was entitled to a self-defense instruction as to his aggravated assault of O'Neil charge, O'Neil was not involved in the physical dispute that occurred between Looney, Connell, Edwards, and McCoy. Outside of yelling at Looney that he was calling the police, O'Neil had no interactions with Looney before Looney walked up to him, pointed his gun at him, and then threatened him about calling the police. *Looney I*, 2018 WL 3485727, at *6. So there is no reasonable possibility that Looney was entitled to self-defense immunity as to his aggravated assault of O'Neil charge.

Affirmed in part and dismissed in part.